851 So.2d 985 (2003)
EAST BATON ROUGE PARISH SCHOOL BOARD and Calcasieu Parish School Board
v.
Murphy J. "Mike" FOSTER, Jr., In His Official Capacity as Governor of the State of Louisiana, John Neely Kennedy, In His Official Capacity as Treasurer of the State of Louisiana, Cecil J. Picard, In His Official Capacity as Superintendent of Education for the State of Louisiana.
No. 2002-CA-2799.
Supreme Court of Louisiana.
June 6, 2003.
Rehearing Denied September 5, 2003.
*987 Hon. Richard P. Ieyoub, Attorney General, Roy A. Mongrue, Jr., Veronica L. Howard, Lee Ann Elizabeth Butler, James H. Napper, II, Richard A. Bordelon, Ralph J. Aucoin, Denechaud & Denechaud; Kenneth Watkins, Watkins, Walker & Eroche; V. Charles Cusimano, for Applicant.
*988 Robert L. Hammonds, Hammonds & Sills; Maxwell G. Kees, Sr., James Spruel, Jr., Kean, Miller, Hawthorne, D'Armond, McCowan & Jarma, for Respondent.
KIMBALL, Justice.
This direct appeal presents the issue of whether certain appropriations from the Education Excellence Fund in Act No. 26 of 2002 violate the provisions of La. Const. art. VII, § 10.8. For the reasons that follow, we conclude that they do. Article VII, § 10.8(A)(1)(d) provides for the appropriation of ten percent of the total monies received in Fiscal Year 2001-2002 to public schools pursuant to subparagraph (C)(3)(d). Act 26, however, appropriates a portion of that ten percent to private schools, state-operated schools, and charter schools in violation of La. Const. art. VII, § 10.8(A)(1)(d). Those appropriations are therefore unconstitutional and Plaintiffs are entitled to a permanent injunction prohibiting the distribution of the funds at issue. The trial court's judgment is affirmed.

Facts and Procedural History
On November 23, 1998, the State of Louisiana entered into a settlement agreement with several major tobacco companies that was approved by consent decree and final judgment in the case of Richard P. Ieyoub, Attorney General, ex rel. State of Louisiana v. Philip Morris, Inc., et al., No. 98-6473 on the docket of the Fourteenth Judicial District for the Parish of Calcasieu (the "Tobacco Settlement"). By constitutional amendments proposed by the legislature in Act No. 1392 of 1999 and approved by the electors of the state, certain proceeds received as a result of the Tobacco Settlement are dedicated to a special permanent trust created in the state treasury known as the Millennium Trust. As is more fully set forth in La. Const. art. VII, § 10.8, which was effective July 1, 2000, the state treasurer is required to deposit in and credit to the Millennium Trust certain monies received as a result of the Tobacco Settlement, and all dividend and interest income and all realized capital gains on investment of the monies in the Millennium Trust. The amount of Tobacco Settlement proceeds to be deposited in and credited to the Millennium Trust each year is set forth in the constitution, as follows: (1) for fiscal year 2000-2001, forty-five percent of the total monies received that year; (2) for fiscal year 2001-2002, sixty percent of the total monies received that year; and (3) for fiscal year 2002-2003 and each fiscal year thereafter, seventy-five percent of the total monies received that year. La. Const. art. VII, §§ 10.8(A)(1)(a), (b), and (c).
The constitution further provides for the establishment of three special funds within the Millennium Trust, the Health Excellence Fund, the Education Excellence Fund, and the TOPS Fund. La. Const. art. VII, § 10.8(A)(2), (3), and (4). Each year, one-third of the Tobacco Settlement proceeds deposited into the Millennium Trust, and one-third of all investment earnings on the investment of the Millennium Trust, are required to be credited by the state treasurer to each of these funds. Id. The constitution authorizes the legislature to increase the amount of the Tobacco Settlement revenues "deposited in the Millennium Trust and credited to the respective funds" by a specific legislative instrument which receives a favorable vote of two-thirds of the elected members of each house of the legislature. La. Const. art. VII, § 10.8(A)(5). Appropriations from each of the three funds are limited to an annual amount not to exceed the estimated aggregate annual earnings from interest, dividends, and certain realized capital gains on investment of the trust. La. Const. art. VII, § 10.8(C)(1).
*989 At issue in this case are appropriations from the Education Excellence Fund. Pursuant to the Louisiana Constitution, appropriations from the Education Excellence Fund are limited to four categories of recipients. First, La. Const. art. VII, § 10.8(C)(3)(a) provides that "[f]ifteen percent of monies available for appropriation in any fiscal year from the Education Excellence Fund shall be appropriated to the state superintendent of education for distribution on behalf of all children attending [approved] private elementary and secondary schools...." Second, La. Const. art. VII, § 10.8(C)(3)(b) provides for a specified appropriation to state-operated schools, such as the Louisiana School for the Deaf, the Louisiana School for Math, Science and the Arts, and the Louis Armstrong High School for the Arts. Third, La. Const. art. VII, § 10.8(C)(3)(c) provides for a specified appropriation for state-approved charter schools. Finally, La. Const. art. VII, § 10.8(C)(3)(d) provides that the remainder of the monies available for appropriation after providing for the purposes enumerated in Subsubparagraphs (a), (b), and (c) shall be made to the State Superintendent of Education for distribution to the public elementary and secondary schools.
Additionally, La. Const. art. VII, § 10.8(A)(1)(d), a provision that deals with both deposits into the Millennium Trust and appropriations from it, states:
For Fiscal Year 2000-2001, Fiscal Year 2001-2002, and Fiscal Year 2002-2003, ten percent of the total monies received in each of those years for credit to the Education Excellence Fund which, notwithstanding the provisions of Subparagraph (C)(1) of this Section, shall be appropriated for the purposes provided in Subsubparagraph (d) of Subparagraph (3) of Paragraph (C) of this Section.
Subsequent to the adoption of the above constitutional provisions, the legislature enacted the Tobacco Settlement Financing Corporation Act, La. R.S. 39:99.1 et seq. The legislature passed this Act because it determined there are risks with respect to the amounts of monies to be received as a result of the Tobacco Settlement that could reduce the amount of funds the state will receive in the future. La. R.S. 39:99.2. In order to reduce the perceived risks, the legislature authorized the sale of a portion of the monies to be received by the state as a result of the Tobacco Settlement to the Tobacco Settlement Financing Corporation, a corporation created as a special purpose, public corporate entity independent of the state. La. R.S. 39:99.12; La. R.S. 39:99.4. The legislature specifically provided that the net proceeds of any authorized sale shall constitute monies received as a result of the Tobacco Settlement as set forth in La. Const. art. VII, § 10.8 and subject to the deposit and credit requirements thereof. La. R.S. 39:99.12(B)(1). Subject to one exception not relevant here, the legislature increased the amount of the net proceeds of any authorized sale to be deposited in the Millennium Trust to one hundred percent. La. R.S. 39:99.12(B)(2).
Pursuant to this statutory authorization, the legislature sold a portion of the Tobacco Settlement, which resulted in a large amount of additional monies received by the state during Fiscal Year 2001-2002. Consequently, the legislature enacted a supplemental appropriations bill, Act No. 26 of 2002, to appropriate the funds received by the Education Excellence Fund from the sale. Specifically, the bill provided for appropriations in the amounts of $17,415,000.00 to private schools "in accordance with Art. VII, Section 10.8(C)(3)(a) of the Constitution of Louisiana," $142,463.00 to specified state-operated schools, $283,479.00 to charter schools, and $81,430,977.00 to public schools "in accordance *990 with Art. VII, Section 10.8(A)(1)(d) and (C)(3)(d) of the Constitution of Louisiana." The Act became effective upon signature by the governor on June 25, 2002.
On July 10, 2002, the East Baton Rouge Parish School Board and the Calcasieu Parish School Board (hereinafter "Plaintiffs") filed the instant suit against Governor Murphy J. "Mike" Foster, Jr., State Treasurer John Neely Kennedy, and Superintendent of Education Cecil J. Picard (hereinafter "Defendants") seeking a declaratory judgment, writ of mandamus and injunctive relief. Alleging that the legislature's supplemental appropriation violated the provisions of La. Const. art. VII, § 10.8(A)(1)(d), Plaintiffs prayed that the district court issue a temporary restraining order prohibiting the Defendants from distributing to any entities other than public school systems the $17,534,482.00 they allege was unconstitutionally appropriated, preliminary and permanent injunctions in the same form and substance as the temporary restraining order, a declaratory judgment that the appropriation of $17,534,482.00 to entities other than those specified in La. Const. art. VII, § 10.8(C)(3)(d) was unconstitutional, and a writ of mandamus directing Defendants to distribute the $17,534,482.00 as dictated by the provisions of La. Const. art. VII, § 10.8. Specifically, Plaintiffs alleged that the original version of the bill that ultimately became Act No. 26 of 2002, House Bill 243, properly appropriated the monies at issue, but subsequent amendments, which decreased the appropriation to public school systems by $17,534,482.00 and increased the appropriation to private schools, state-operated schools, and charter schools by an equal amount, rendered the appropriation unconstitutional.[1]
On the same day the petition was filed, the district court issued a temporary restraining order prohibiting Defendants "from distributing to any entities other than the public school systems of the State the $17,534,482.00 which was reduced from the appropriation to the public school systems by the amendments to House Bill 243 of 2002 incorporated into Act 26 of 2002."
In response to Plaintiffs' petition, each of the Defendants filed a dilatory exception of improper cumulation of actions, asserting that Plaintiffs were improperly attempting to cumulate their mandamus action, which is a summary proceeding, with their action for declaratory judgment, which is an ordinary proceeding. Each of the Defendants also raised a peremptory exception of no cause of action as to Plaintiffs' petition for writ of mandamus. Additionally, several Catholic Dioceses and non-public elementary and secondary schools eligible to receive state funds filed a petition of intervention that was granted by the district court.[2] After a hearing on *991 July 24, 2002, the district court maintained Defendants' exceptions of improper cumulation of actions and severed Plaintiffs' request for writ of mandamus from their request for declaratory judgment and injunctive relief. At the same time, however, the district court maintained Defendants' exceptions of no cause of action as to Plaintiffs' petition for writ of mandamus. The district court also maintained Governor Foster's exception of no cause of action as to Plaintiffs' request for injunctive relief.
Turning to Plaintiffs' request for a preliminary injunction against the remaining Defendants, the district court granted a preliminary injunction, enjoining Defendants "from distributing to any entities other than the public school systems of the State or the State Department of Education on behalf of the public school systems of the State the funds which were reduced from the appropriation to public school systems by the amendment to House Bill 243 of 2002 incorporated into Act 26 of 2002."[3] In its oral reasons for judgment on this issue, the district court stated:
[T]he court finds that the issue presented centers on appropriations made for the Fiscal Year 2001/2002 to provide the distribution from funds received in the Tobacco Settlement proceeds.... Of importance to this issue ... are the provisions of Section 10.8(A)(1)(d), which provides for [an] additional deposit to the Millennium Trust from the settlement proceeds.... This court finds that the meaning of Section 10.8 is clear and unambiguous. (A)(1)(d) provides that for the three years, an additional sum would be deposited from the settlement proceeds to the Educational Excellence Fund for appropriation for the purposes provided in (C)(3)(d), which only provides for appropriations for the public schools. Had this additional 10 percent been means for appropriation to all of the categories enumerated for distribution on the Educational Excellence Fund, no reference would have been necessary other than Subparagraph 3 of Paragraph C. Yet, (A)(1)(d) clearly requires that appropriation shall be for the purposes provided in (d) only. No references made to (a), (b), or (c). Further, the proposal for the constitutional amendment placed on the ballot and voted upon by the citizens of this state clearly provided the additional 10 percent of each year's total proceeds shall be deposited for appropriation to public elementary and secondary schools. This court understands the actions of the legislature in passing Act 26. At the time of the drafting of the constitutional amendment providing for distribution of proceeds from the Tobacco Settlement, no one envisioned a sale of any of the settlement, and, therefore, the windfall in one particular year was not contemplated nor provided for.... However, 10.8(A)(1)(d) is clear and its provisions *992 must be given effect. It mandates that the additional 10 percent shall be appropriated for the purposes of (C)(3)(d) only. It is obvious to the court that Act 26 contains appropriations not in compliance with this paragraph....
Plaintiffs' requests for a declaratory judgment and permanent injunctive relief were subsequently tried on October 9, 2002. At the conclusion of the hearing, the district court signed a judgment granting Plaintiffs' request for a permanent injunction in the form and substance of the temporary restraining order and the preliminary injunction. The district court also declared unconstitutional Act No. 26 of 2002 "to the extent that Act 26 calls for the distribution of the funds which are the subject of the permanent injunction to any schools or entities other than the public school systems of the State of Louisiana or to the State Superintendent of Education on behalf of those public school systems."
Defendants[4] and Intervenors appealed the district court's judgment directly to this court pursuant to La. Const. art. V, § 5(D), which provides that a case shall be appealable to this court if a law has been declared unconstitutional.

Discussion
The issue presented by this case is a narrow one. We must determine whether the appropriations from the Education Excellence Fund in Act 26 violate the provisions of La. Const. art. VII, § 10.8(A)(1)(d). That is, we must analyze whether the constitution allows the private schools, the state-operated schools, and the charter schools to receive a portion of the entire amount placed in the Education Excellence Fund for appropriation to the schools or whether they are entitled only to receive a portion of the interest income placed into the Fund for appropriation to the schools. All parties agree that the monies at issue are proceeds from the sale of a portion of the monies to be received as a result of the Tobacco Settlement. Additionally, there is no dispute regarding the lump sum allocated to the Education Excellence Fund for appropriation in Fiscal Year 2001-2002. Finally, the parties seem to agree that the appropriation of $17,415,000.00 to private schools in Act 26 is approximately fifteen percent of the total monies allocated to the Education Excellence Fund for appropriation in Fiscal Year 2001-2002.
As an initial matter, we must examine whether the provisions of La. Const. art. VII, § 10.8 are applicable to the proceeds received from the sale of a portion of the monies to be received as a result of the Tobacco Settlement.[5] In creating the Millennium Trust, La. Const. art. VII, § 10.8(A)(1) provides that "the treasurer shall deposit in and credit to the Millennium Trust certain monies received as a result of the" Tobacco Settlement. That provision goes on to state that in Fiscal Year 2001-2002, the treasurer shall deposit in and credit to the Millennium Trust "sixty percent of the total monies received that year" as a result of the Tobacco Settlement. However, the percentage of Tobacco Settlement revenues "deposited in the Millennium Trust and credited to the respective funds may be increased" by an Act receiving a two-thirds vote of the legislature. La. Const. art. VII, § 10.8(A)(5).
*993 The plain language of § 10.8(A)(1)(b) requires that at least sixty percent of the total monies received during Fiscal Year 2001-2002 as a result of the Tobacco Settlement must be deposited into the Millennium Trust. The Tobacco Settlement Financing Corporation Act, the Act that allows the sale of a portion of the tobacco assets, exists only because of the rights the state obtained under the Tobacco Settlement. We find that the proceeds of a sale of a portion of the monies to be received under the Tobacco Settlement constitute part of the "total monies received as a result of the Tobacco Settlement" so that the provisions of La. Const. art. VII, § 10.8 are applicable to those proceeds. Although it does not appear the sale of a portion of the monies to be received under the Tobacco Settlement was contemplated by either the legislature or the voters when § 10.8 was passed, this does not change the applicability of the constitutional article, as the monies from the sale are clearly included within the provisions relating to "total monies received" as a result of the Tobacco Settlement. Once these monies are deposited to the Millennium Trust, the constitutional analysis is the same whether the proceeds were received as a result of a yearly payment or a sale of a portion of the tobacco assets. The legislature passed the Tobacco Settlement Financing Corporation Act to reduce risks "which could reduce the anticipated amounts of monies to be received in the future." La. R.S. 39:99.2. The risks that concerned the legislature include the adjustments provided for in the Tobacco Settlement based upon tobacco consumption, litigation, and potential further regulation of the tobacco industry. Id. In order to reduce these risks associated with the Tobacco Settlement and the credit risks associated with the tobacco industry, risks that might lower, or even discontinue, future payments, the legislature determined it was in the best interest of the state to convert the potential future payments to current assets to be deposited in the Trust. Id. The sale was therefore approved to take the place of a portion of uncertain future payments, and was passed with the intention to benefit the private, state-operated, and charter schools, as well as the public schools. The sale proceeds are consequently subject to the provisions of La. Const. art. VII, § 10.8.
The legislature correctly recognized the applicability of § 10.8 to the sale proceeds as it provided in La. R.S. 39:99.12 that the net proceeds of any authorized sale of the tobacco assets "shall constitute monies received as a result of the master settlement agreement, as set forth in Article VII, Sections 10.8 and 10.9, respectively, of the Louisiana Constitution, subject to the deposit and credit requirements thereof." Additionally, utilizing the constitutional authority provided to it in § 10.8(A)(5), the legislature increased the amount of the net proceeds of an authorized sale that are to be deposited in and credited to the Millennium Trust to one hundred percent.[6]
Although correctly recognizing the applicability of La. Const. art. VII, § 10.8 to the facts of this case, Intervenors assert that by increasing the percentage of the net proceeds of an authorized sale that are to be deposited in and credited to the Millennium Trust to one hundred percent, the legislature utilized its authority under § 10.8(A)(5) to eliminate the ten percent provision found in § 10.8(A)(1)(d). That is, Intervenors argue that by increasing the amount of monies to be deposited in and credited to the Millennium Trust in Fiscal *994 Year 2001-2002 from sixty percent to one hundred percent, there is no additional ten percent to be appropriated pursuant to § 10.8(A)(1)(d). This argument, however, is not persuasive as it fails to take into account the nature of the authority provided to the legislature in § 10.8(A)(5) and the nature of the monies allocated to the Education Excellence Fund for appropriation in accordance with § 10.8.
As stated earlier, La. Const. art. VII, § 10.8(A)(5) gives the legislature the authority to increase the amount of Tobacco Settlement revenues deposited in the Millennium Trust and credited to the respective funds by two-thirds vote of each house of the legislature. In La. R.S. 39:99.12(B)(2), the legislature took advantage of this authority to increase the amount of Tobacco Settlement revenues deposited in the Millennium Trust. Because the sale at issue took place in Fiscal Year 2001-2002, La. R.S. 39:99.12(B)(2) served to increase the amount of the sale proceeds deposited into the Millennium Trust from sixty percent, as provided in La. Const. art. VII, § 10.8(A)(1)(b), to one hundred percent.
The ten percent provision that Intervenors claim was eliminated by La. R.S. 39:99.12(B)(2) requires that for Fiscal Year 2001-2002 an additional ten percent of the total monies received that year as a result of the Tobacco Settlement shall be credited to the Education Excellence Fund for appropriation for the purposes provided in § 10.8(C)(3)(d). Although La. Const. art. VII, § 10.8(A)(5) allows the amount of Tobacco Settlement revenues deposited in the Millennium Trust and credited to the respective funds to be increased by a two-thirds vote of each house of the legislature, it does not allow amount of revenues credited to the funds to be decreased by the legislature. The legislature is therefore without authority to eliminate the ten percent provision found in La. Const. art. VII, § 10.8(A)(1)(d). Thus, if Intervenors' argument that the legislature eliminated the requirements of § 10.8(A)(1)(d) by the passage of La. R.S. 39:99.12(B)(2) is correct, then the legislature would have acted unconstitutionally in this regard. We do not find the legislature attempted to eliminate the ten percent requirement, however. Instead, we find the most reasonable construction of the provisions at issue to be that ten percent of the total monies received from the sale is deposited into the Millennium Trust for credit to the Education Excellence Fund for appropriation for the purposes provided in § 10.8(C)(3)(d), fifty million dollars is deposited into the Louisiana Fund pursuant to La. R.S. 39:99.12(B)(3), and the remainder is deposited in and credited to the Millennium Trust. The record reveals that this construction is consistent with the manner in which the provisions of La. Const. art. VII, § 10.8 were applied in Fiscal Year 2000-2001 and about which there was no dispute. Further, such construction harmonizes the constitutional provisions with the Tobacco Settlement Financing Corporation Act in a reasonable, constitutional way.
Intervenors' argument that the legislature's passage of La. R.S. 39:99.12(B)(2) eliminated the viability of § 10.8(A)(1)(d) is also belied by its argument that it is entitled to fifteen percent of the total amount allocated to the Education Excellence Fund for appropriation for Fiscal Year 2001-2002. Article VII, § 10.8(C)(1) clearly states that appropriations from the Education Excellence Fund "shall be limited to an annual amount not to exceed the estimated aggregate annual earnings from interest, dividends, and realized capital gains on investment of the trust as recognized by the Revenue Estimating Conference." The record reveals, through properly admitted evidence, that a portion of the monies to be appropriated in Fiscal *995 Year 2001-2002 from the Education Excellence Fund was not limited to interest income from the Trust, but instead included ten percent of the Tobacco Settlement revenue from that Fiscal Year. It is only through the application of La. Const. art. VII, § 10.8(A)(1)(d) that appropriations from the Education Excellence Fund may be greater than the estimated aggregate annual earnings from interest, dividends, and realized capital gains on investment of the trust since that provision allows the appropriation of ten percent of the total monies received as a result of the Tobacco Settlement in Fiscal Year 2001-2002 "notwithstanding the provisions of [§ 10.8(C)(1) ]." The record reveals that for Fiscal Year 2001-2002, the total amount to be appropriated from the Education Excellence Fund was approximately $117,000,000.00, but only $3,600,000.00 of that amount was generated by interest earned by the Trust. Most of the remainder of that amount was generated as a result of the application of § 10.8(A)(1)(d). No party disputes the validity of the amount, derived in part pursuant to the provisions of La. Const. art. VII, § 10.8(A)(1)(d), allocated to the Education Excellence Fund for appropriation in Fiscal Year 2001-2002. Thus, Intervenor's argument that the ten percent provision was eliminated by La. R.S. 39:99.12(B)(2) is unfounded.
Having determined that the provisions of La. Const. art. VII, § 10.8 apply to the sale proceeds at issue and that subsection (A)(1)(d) remains viable after the passage of La. R.S. 39:99.12(B)(2), we now turn to the issue of whether the appropriations from the Education Excellence Fund in Act 26 violate the provisions of La. Const. art. VII, § 10.8.
At the outset, we again note that the total amount allocated to the Education Excellence Fund for appropriation in Fiscal Year 2001-2002 was approximately $117,000,000.00. Of this amount, $17,415,000.00, or approximately fifteen percent, was appropriated by Act 26 to approved private schools in accordance with La. Const. art. VII, § 10.8(C)(3)(a). Relatively small sums were appropriated to state-operated schools and charter schools in accordance with La. Const. art. VII, § 10.8(C)(3)(b) and (c). The remainder, or $81,430,977.00, was appropriated to public schools in accordance with La. Const. art. VII, § 10.8(A)(1)(d) and (C)(3)(d).[7] We must now determine whether these appropriations comport with the provisions of § 10.8.
La. Const. art. VII, § 10.8(A)(1)(d) provides that for Fiscal Year 2001-2002, ten percent of the total monies received for credit to the Education Excellence Fund "shall be appropriated for the purposes provided in [§ 10.8(C)(3)(d)]." Section 10.8(C)(3)(d) provides that public schools shall receive the remainder "of the monies available for appropriation after providing for the purposes enumerated in Subsubparagraphs (a), (b), and (c) of this Subparagraph...." Subsubparagraphs (a), (b), and (c) provide for the fifteen percent appropriation for approved private schools and the specified appropriations for state-operated and charter schools as discussed above.
Plaintiffs contend the non-public schools are not entitled to share in the additional ten percent provided by § 10.8(A)(1)(d) because *996 that provision clearly mandates that the sum is to be appropriated for public school purposes. Defendants and Intervenors, on the other hand, point out that subsection (A)(1)(d) refers to subsection (C)(3)(d), which provides for appropriations to the public schools only after appropriations to the private, state-operated, and charter schools have been made. Our task, then, is to determine whether "the purposes provided in [§ 10.8(C)(3)(d)]" include the purposes of the public schools only, or whether they include the purposes of the private, state-operated, and charter schools as well as those of the public schools.
The starting point in the interpretation of constitutional provisions is the language of the constitution itself. Louisiana Mun. Ass'n v. State, 00-0374, p. 5 (La.10/6/00), 773 So.2d 663, 667. When a constitutional provision is plain and unambiguous, and its application does not lead to absurd consequences, its language must be given effect. Id. at pp. 5-6, 773 So.2d at 667; State ex rel. Guste v. Board of Com'rs of Orleans Levee Dist., 456 So.2d 605, 609 (La.1984); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354, 356 (La.1980).
When the constitutional language is subject to more than one reasonable interpretation, however, the determination of the intent of the provision becomes necessary. Louisiana Mun. Ass'n, 00-0374 at p. 6, 773 So.2d at 667. In seeking to ascertain constitutional intent, the same general rules used in interpreting laws and written instruments are followed. Caddo-Shreveport Sales & Use Tax Comm'n v. Office of Motor Vehicles, 97-2233, p. 6 (La.4/14/98), 710 So.2d 776, 780; Radiofone, Inc. v. City of New Orleans, 93-0962, p. 6 (La.1/14/94), 630 So.2d 694, 698. This court has stated that the function of a court in construing constitutional provisions is to ascertain and give effect to the intent of the people who adopted it. Caddo-Shreveport, 97-2233 at p. 7, 710 So.2d at 780; Radiofone, 93-0962 at p. 6, 630 So.2d at 698. Additionally, we have determined that the understanding that can reasonably be ascribed to the voting population as a whole controls the interpretation. Id. In other cases, however, this court has stated that in construing constitutional provisions, a court should ascertain and give effect to the intent of both the framers of the amendment and of the people who adopted it. See Board of Com'rs of Orleans Levee Dist. v. Department of Natural Resources, 496 So.2d 281, 298 (La. 1986) (on rehearing). All of these principles are correct statements of law. Nevertheless, to harmonize them, we will add that in construing an ambiguous constitutional provision, a court should ascertain and give effect to the intent of both the framers of the provision and of the people who adopted it; however, in the case of an apparent conflict, it is the intent of the voting population that controls. See Arata v. Louisiana Stadium & Exposition Dist., 254 La. 579, 225 So.2d 362, 372 (1969).
The trial court found the language used in § 10.8(A)(1)(d) is clear and unambiguous because of its specific reference to § 10.8(C)(3)(d). According to the trial court, had the constitution intended to provide for the appropriation of the additional ten percent to private, state-operated, charter, and public schools, it need only have referenced § 10.8(C)(3), the provision under which appropriations to each category of school are specified. We agree with the trial court that it would be clear that all the schools are entitled to share in the additional ten percent provided for in § 10.8(A)(1)(d) had the constitutional language referenced only subsection (C)(3) instead of subsection (C)(3)(d). Similarly, it would be clear that only the *997 public schools are entitled to receive the additional ten percent if subsection (C)(3)(d) made no reference to subsections (C)(3)(a), (b), and (c). In fact, however, the constitutional language references the purposes provided in subsection (C)(3)(d), which in turn refers to the purposes enumerated in subsections (C)(3)(a), (b), and (c). In light of the actual constitutional language employed, we find that the reference in La. Const. art. VII, § (A)(1)(d) to "the purposes provided in [§ 10.8(C)(3)(d)]" is ambiguous. That phrase can be understood to mean that only the public schools are entitled to receive the additional ten percent or that the public schools are entitled to receive the remainder of the ten percent after the schools referred to in subsections (C)(3)(a), (b), and (c) have received their enumerated share. Therefore, we believe that both of the interpretations postulated by the opposing parties are plausible. Consequently, we must examine the intent of the provision and attempt to ascertain the understanding that can be reasonably ascribed to the framers and the voting population as a whole.
Act No. 1392 of 1999 proposed to add art. VII, § 10.8 to the constitution "to create the Millennium Trust ... and the Education Excellence Fund," and "to provide for [the] deposit of monies into the Millennium Trust and the credit of monies to the funds within the trust...." The original version of the bill that ultimately became Act No. 1392 did not contain any ten percent equivalent to that currently found in § 10.8(A)(1)(d). Subsequently, the language used in § 10.8(A)(1)(d) was added to the proposed bill in conference committee. The Minutes of the Conference Committee Meeting at which the proposed addition was discussed reflect the following: "In FY 2000-2001 through FY 2002-2003, an additional 10% of settlement proceeds will be credited to the Education Excellence Fund for public schools." House Committee on Appropriations, Minutes of Conference Committee Meeting, June 21, 1999, p. 2. Section 4 of Act No. 1392 also contained the official ballot language to be presented to the voters of the state. Regarding the ten percent provision at issue, the ballot stated:
[I]n Fiscal Years 2000-2001 through 2002-2003; to provide that an additional ten percent of each year's total proceeds shall be deposited for credit to the Education Excellence fund for appropriation to public elementary and secondary schools....
The voters approved the adoption of La. Const. art. VII, § 10.8 on October 23, 1999.
After consideration of the above materials which were generated contemporaneously with the adoption of La. Const. art. VII, § 10.8, we find the intent of both the legislature and the voters as a whole was that the additional ten percent provided for in La. Const. art. VII, § 10.8(A)(1)(d) is to be appropriated solely to the public schools and the private, state-operated, and charter schools are not entitled to any portion of the additional ten percent. The minutes from the conference committee considering the language of subsection (A)(1)(d) clearly reflect that the committee understood the additional ten percent was to be appropriated for use by the public schools. Similarly, the ballot language clearly provides that the additional ten percent is to be appropriated to public schools. No mention is made of the private schools in any context connected with the additional ten percent. Finally, as recognized by the trial court, had there been an intent to allocate the additional ten percent among private, state-operated, charter, and public schools, the constitution need not have referenced § 10.8(C)(3)(d). Instead, it could have simply stated that ten percent of the total *998 monies received in the specified years, notwithstanding the provisions of subsection (C)(1), were to appropriated for the purposes provided in subsection (C)(3). In light of the above, we find the provisions of La. Const. art. VII, § 10.8(A)(1)(d) enure solely to the benefit of the public schools as provided in § 10.8(C)(3)(d).
In opposition to this interpretation of subsection (A)(1)(d), Defendants argue that the legislative history of Act No. 26, the Act that provided for the appropriations at issue in this case, supports their contention that the additional ten percent provided for by subsection (A)(1)(d) should be shared among all the schools mentioned in subsection (C)(3). As originally introduced, the bill that ultimately became Act No. 26 provided for an appropriation of the entire additional ten percent to the public schools and an appropriation of fifteen percent of the interest income for the private schools. On June 7, 2002, the Senate Committee on Finance met to consider an amendment to that proposed bill. A portion of the transcript from that meeting reflects the following when the appropriation of $382,000 from the Education Excellence Fund to the private schools was considered:
Stockstill: When you first set up the, when you first trusted the tobacco money, you put ten percent of the proceeds would go to local school districts.
* * *
Hainkel: And some of it was supposed to go to, there was a percentage supposed to be going to private and parochial schools. What was it, 15(%) or 13(%) based on the number of citizens in each one? That was our original deal.
Stockstill: Right. And when you sold the tobacco money, the ten percent generated this amount of money.
Hainkel: And where is the part for the private and parochial schools?
Rochelle: That's the next item, $382,000.
Hainkel: That's not ... fifteen percent of $98 million.
Paul Fernandez: Paul Fernandez with the Office of Planning and Budget. No sir. The interest earned is the amount that is going to the private schools.
Hainkel: But it wasa deal is a deal. Thirteen percent or fifteen, whatever it was in the trust, is supposed to go to private schools and the rest to the public schools. That's what we arranged when we passed it. It was very clear.
Fernandez: And yes sir, in working with the House staff and them drafting the bill for this, that the intent was that the interest earned would be coming in the Educational Excellence Fund was to go to.
Hainkel: That isn't the author's intent. Foster Campbell brought this to me and he handled the whole thing. We handled the negotiations, Senate President Ewing and I, Campbell, it was supposed to be divided up. There wasn't any question about what it was supposed to be.
Fernandez: And this was us working with the House and this was the way it was drafted.
Hainkel: Well, it may be but that's improper so we're going to have to amend that and do it the way Senator Campbell indicated it should have been done. He was the father of this deal, we voted for it and all of us knew what we were voting for. Yea, we're going to send up an amendment to correct it. There wasn't any question about it. I mean, it was Campbell's baby from the beginning....
* * *
Hainkel: Alright, my amendment speaks to the issue I brought up when we passed the Millennium Trust there was an agreement between all parties to incorporate Senator Foster Campbell's *999 concept of having some monies for all of the schools in the state and he divided it on a pro rata basis, part of it was to go to the parochial and private schools and... they were left out.... I don't think there was any question about what everybody's intent was when we passed that legislation.
The events that transpired in the Finance Committee during the deliberation of the bill that ultimately became Act 26 of 2002 would be relevant if it were necessary to determine the legislature's intent in passing that Act. Act 26, however, is itself clear in the amounts appropriated to each category of school. Additionally, it is clear that in passing Act 26, the legislature intended that the additional ten percent provided for in La. Const. art. VII, § 10.8(A)(1)(d) be shared among private, state-operated, charter, and public schools. The problem presented by this case, however, is not the proper interpretation of Act 26, but is instead the proper interpretation of La. Const. art. VII, § 10.8 in general and subsection (A)(1)(d) in particular. It is the contemporaneous history surrounding the adoption of La. Const. art. VII, § 10.8, such as the conference committee minutes and the ballot language presented to the public discussed above, that is relevant in determining the intent of the framers and of the voting population as a whole.
Defendants, however, attempt to use the foregoing deliberations of the Finance Committee regarding that bill that ultimately became Act 26 to bolster their argument that the intent of § 10.8(A)(1)(d) was that the additional ten percent be shared among private and public schools. This argument, however, is misplaced. While we do not doubt the recollections of Senators Hainkel and Campbell regarding the history of the adoption of § 10.8, their recollection is at odds with the version of the final bill that ultimately became La. Const. art. VII, § 10.8. As shown by the minutes of the conference committee that proposed the final version of the bill and the ballot language presented to the public, it is clear that the intent of subsection (A)(1)(d) was that the additional ten percent be appropriated solely to the public schools. Furthermore, this court has previously recognized that the post-enactment statements of legislators on legislative intent have generally been excluded as having "limited value to an understanding of the clear meaning and legal effect of a statute." Louisiana Mun. Ass'n, 00-0374 at p. 12 n. 7, 773 So.2d at 670 n. 7 (quoting Norman J. Singer, Statutes and Statutory Construction, § 48.20 (6th ed.2000)). Additionally, the understanding of one member, or even a few members, of the legislature is not determinative of legislative intent. Macon v. Costa, 437 So.2d 806, 812 n. 11 (La. 1983). See also Arata, 225 So.2d at 372 ("The understanding of these two members, however, does not establish a consensus of the 105 members of the House and 39 of members of the Senate which we would consider necessary to establish the legislative intent."). Finally, and perhaps most importantly, of primary concern is the intent of the people who adopted the amendment. Id. In light of the ballot language that clearly indicates the additional ten percent is to be appropriated to the public schools, we find the above discussion among a small number of legislators three years after the adoption of the language at issue cannot serve to evidence an intent contrary to that most reasonably ascribed to the legislators and the voting population as a whole at the time the constitutional provision was adopted.
Finally, Defendants and Intervenors contend that they are entitled to fifteen percent of the entire sum of money available for appropriation in Fiscal Year *1000 2001-2002 from the Education Excellence Fund pursuant to La. Const. art. VII, § 10.8(C)(3)(a). Thus, they assert, the appropriation provided to them by Act 26, which is fifteen percent of the entire amount available for appropriation from the Education Excellence Fund, is reasonable. This argument, however, fails when § 10.8 is considered as a whole.
If at all possible, constitutional provisions should be construed to allow each provision to stand and be given effect. Guste, 456 So.2d at 609. Here, we have already determined that the additional ten percent provided in § 10.8(A)(1)(d) must be appropriated to the public schools. Appropriations to approved private schools are governed by subsection (C)(3)(a). That subsection provides that approved private schools shall receive an appropriation, limited to an annual amount not to exceed the estimated aggregate annual earnings from interest, dividends, and realized capital gains by subsection (C)(1), from the Education Excellence Fund in the amount of "[f]ifteen percent of monies available for appropriation in any fiscal year from the Education Excellence Fund...." This subsection cannot be read to require that the private schools share in the additional ten percent for two reasons. First, the additional ten percent consists of actual revenues received as a result of the obligations incurred by the tobacco companies in the Tobacco Settlement, and is not limited to investment income. Thus, the provisions of subsection (C)(3)(a), which are subject to the annual investment earnings limitation of subsection (C)(1), cannot serve to dictate a required appropriation from the additional ten percent, an amount derived from sources other than investment income under a provision not encumbered with the limitation of subsection (C)(1). Second, the additional ten percent is not "available for appropriation" from the Education Excellence Fund as that phrase is used in subsection (C)(3)(a) because the ten percent is earmarked from the beginning of its allocation to the Education Excellence Fund for appropriation to the public schools. We find, therefore, that the private schools are not entitled to an appropriation equal to fifteen percent of the entire amount allocated to the Education Excellence Fund for appropriation in Fiscal Year 2001-2002.
In the instant case, the legislature, in Act No. 26 of 2002, appropriated a portion of the additional ten percent provided for in La. Const. art. VII, § 10.8(A)(1)(d) to private, state-operated, and charter schools. This appropriation was clearly in violation of the constitutional mandate that the additional ten percent of total monies received in Fiscal Year 2001-2002 be appropriated only to public schools pursuant to subsection (C)(3)(d). We therefore find that Act 26 is unconstitutional to the extent it appropriates a portion of the additional ten percent of total monies received in 2001-2002 from the Education Excellence Fund to schools other than the public schools as provided for in subsection (C)(3)(d). The trial court's judgment finding Act 26 unconstitutional to this extent is affirmed. Additionally, a petitioner is entitled to injunctive relief without a showing of irreparable injury or that no other adequate legal remedy exists when the conduct sought to be restrained is unconstitutional. Jurisich v. Jenkins, 99-0076 (La.10/19/99), 749 So.2d 597. Because Plaintiffs sought a permanent injunction to prohibit the distribution of funds pursuant to an unconstitutional appropriation, the trial court's judgment granting a permanent injunction is affirmed.

Decree
The trial court's judgment granting Plaintiffs' request for a permanent injunction prohibiting Defendants from distributing *1001 to any entities other than the public school systems of the state or the State Department of Education on behalf of the public schools systems of the state those funds held in the state treasury totaling $17,444,859.00 and itemized in Exhibit A to response to plaintiffs' petition for injunction relief and application for temporary restraining order by John Neely Kennedy in his capacity as Treasurer of the State of Louisiana is affirmed. Similarly, the trial court's judgment declaring Act 26 unconstitutional to the extent that it calls for distribution of the funds which are subject to the permanent injunction to any schools or entities other than the public school systems of the State of Louisiana or to the State Superintendent of Education on behalf of those public school systems is affirmed.
Affirmed.
WEIMER and VICTORY, JJ., dissent and assign reasons
TRAYLOR, J., dissents for reasons assigned by WEIMER.
VICTORY, J., dissent and assigns reasons.
I agree with most of Justice Weimer's dissent, including his interpretation of the constitutional provision at issue.
The people of this state passed a constitutional provision that would guarantee income from the Tobacco Settlement for the public and private schools for many years to come. Even under the majority's interpretation of the constitution, only a small percentage of the corpus was to be appropriated for the first three years, thus leaving the bulk of the settlement funds received thereafter to be divided per the constitutional provision between the public and private schools. Yet the sale of a portion of the Tobacco Settlement moved a great deal of these monies that were anticipated by the voters to be received in years after the first three years into that three year window. This amounts to a huge windfall to the public schools at the expense of the private schools in plain violation of the intent of the voters at the time of passage of the constitutional provision.
In my view, the Act at issue is the legislature's proper exercise of its power to remedy a result foreign to the intent of the voters in passing the constitutional provision, and I would uphold its constitutionality.
WEIMER, J., dissents and assigns reasons.
Because of the sale of a portion of the monies to be received in the future by the State as a result of the Tobacco Settlement, the State received a financial windfall during the fiscal year 2001-2002. Thus, because of the sale, the State received a one-time lump sum payment rather than receiving the monies from the Tobacco Settlement in an income stream paid in future years.
At issue is the interpretation of a constitutional provision. The interpretation will determine whether the public schools alone should benefit from this one-time windfall of monies or should this windfall be shared with private schools and schools for the deaf and visually impaired, among other schools. Although the constitutional provision at issue is not the model of concise draftsmanship, a careful evaluation of its language results in the determination the provision is not ambiguous.
Louisiana Constitution Article VII, § 10.8 establishes the Millennium Trust. At the center of this matter is an evaluation of Section 10.8(A)(1)(d) which in turn references (C)(3)(d) which in turn references (C)(3)(a),(b), and (c). The cross references from one provision to another result in the constitutional provision being difficult to evaluate, but that difficulty does *1002 not result in the provision being ambiguous.
Subsection (A)(1)(d)[1] provides that for three fiscal years, "ten percent of the total monies received" shall be credited to the Education Excellence Fund and "shall be appropriated for the purposes provided in Subsubparagraph (d) of Subparagraph (3) of Paragraph (C)."[2] Thus, (A)(1)(d) directs one to (C)(3)(d).[3] In turn, paragraph (C)(3)(d)[4] provides that from fiscal year 2000-2001 through fiscal year 2006-2007 the "monies available for appropriation" shall be distributed to the public schools "after providing for the purposes enumerated in Subsubparagraphs (a), (b), and (c)." Thus, (C)(3)(d) directs one to (C)(3)(a), (b) and (c).[5]
Subsection (C)(3)(a) provides "[f]ifteen percent of monies available for appropriation *1003 in any fiscal year from the Education Excellence Fund shall be appropriated to the state superintendent of education for distribution on behalf of all children attending [approved] private elementary and secondary schools." (Emphasis added.) (For ease of reference, hereafter referred to as "private schools.")
Subsection (C)(3)(b) provides "appropriations shall be made each year" to certain specified schools, including schools for the deaf, visually impaired and the Special Education Center in Alexandria. (Emphasis added.) (For ease of reference, hereafter collectively referred to as "special schools.")
Subsection (C)(3)(c) provides appropriations may[6] be made for approved independent public schools and alternative schools. (For ease of reference, hereafter collectively referred to as "alternative schools.")
The appropriations to the public schools are not mentioned in (C)(3)(d) until subsubsubparagraphs (i) and (ii). See footnote 4. Thus, based on this placement within constitutional provision (C)(3)(d), the appropriations to the public schools involve the residual monies "after providing for the purposes enumerated in Subsubparagraphs (a), (b), and (c)" of (C)(3) which provide for appropriations to the private, special and alternative schools. (Emphasis added.) In sum, not until "after" addressing the distributions to the private, special and alternative schools is the appropriation to the public schools addressed.
Difficulty in evaluating a provision is not synonymous with ambiguity. Stripping away the cross referencing, the constitutional provision clearly states ten percent of the "total monies received" for three fiscal years goes to the Education Excellence Fund, as opposed to the public schools. "[A]fter providing for the purposes enumerated," which purposes include fifteen percent of the monies from the Education Excellence Fund being distributed in any fiscal year on behalf of all children attending private schools and other appropriations made to the special schools and potentially to the alternative schools, the residual is distributed to the public schools.
Subsection (A)(1)(d) is designed to allow ten percent of the "total monies received" to be utilized to boost the Education Excellence Fund for the initial three fiscal years of the Millennium Trust. Subsection (A)(1)(d) by its terms is not limited to "earnings from interest, dividends, and realized capital gains on investment of the trust" as provided in (C)(1).[7] Instead, (C)(1) is specifically excluded from (A)(1)(d) with the language "notwithstanding the provisions of Subparagraph (C)(1)."[8] The import is that both ten *1004 percent of the "total monies" received and the "earnings from interest, dividends, and realized capital gains" are shared between the public, private, special, and potentially the alternative schools.
The proceeds of the sale of a portion of the Tobacco Settlement monies comprise a part of the "total monies received" to boost the Education Excellence Fund. Again, nothing in the text of (A)(1)(d) references the public schools. The words "public schools" never appear in the text of (A)(1)(d); it is the Education Excellence Fund which is specified. Nothing in the text of (C)(3)(d) mentions the public schools until after the private, special, and alternative schools have been funded.
Two principles guide this evaluation. The legislature is presumed to act in conformity with the constitution. See, e.g., Johnson v. Welsh, 334 So.2d 395 (La.1976). Laws should not be declared unconstitutional unless, beyond all doubt, the laws are unconstitutional. White Hall Agr. Co. v. Police Jury of Concordia Parish, 128 La. 668, 678, 55 So. 11, 14 (1911).
In State ex rel. Labauve v. Michel, 121 La. 374, 380-381, 46 So. 430, 432 (1908), this court stated:
[E]very doubt must be resolved in favor of the statute. The Legislature is, of necessity, in the first instance to be the judge of its own constitutional powers. Their manifest duty is never to exercise a power of doubtful constitutionality. Doubt in their case, as in that of the court, should be conclusive against all affirmative action. If a court in such a case were to annul the law while entertaining doubts upon the subject, it would present the absurdity of one department of the government overturning, in doubt, what another had established in settled conviction, and to make the dubious constructions of the judiciary outweigh the fixed conclusions of the General Assembly.
The law on this point may be taken from any text-book. Black on Const. Law, p. 61 expresses it as follows:
"Legislators as well as judges, are bound to obey and support the Constitution, and it is to be understood that they have weighed the constitutional validity of every act they pass. Hence the presumption is always in favor of the constitutionality of the statute. Every reasonable doubt must be resolved in favor of the statute, not against it; and the court will not adjudge it invalid unless its violation of the Constitution is, in their judgment, clear, complete, and unmistakable."
Also, if the language is clear and unambiguous, one does not evaluate the intent. LSA-C.C. art. 9. As stated in Louisiana Department of Agriculture and Forestry v. Sumrall, 98-1587, pp. 4-5 (La.3/2/99), 728 So.2d 1254, 1258:
We have established that articles of the constitution are to be interpreted using the same canons of interpretation applicable to statutes. "Constitutional provisions are to be construed and interpreted by the same rules as are other laws." ... Thus, "when a constitutional provision is plain and unambiguous, its language must be given effect." ... This principle, most basic to civilian methodology, has been in our Civil Code since 1870: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."... Therefore when interpreting a constitutional provision, the "starting point" *1005 is with the language of the provision. [Citations omitted.]
Granted, the minutes of the conference committee and the official ballot language presented to the voters are persuasive secondary sources as pointed out in the majority opinion. However, when a law is clear and unambiguous, these secondary sources cannot trump the language of the constitution. Id. The minutes of the conference committee and the ballot language indicate an additional ten percent of each year's total proceeds shall be deposited for credit to the Education Excellence Fund for appropriation to public schools. However, neither references an intent that there be no sharing of these proceeds with the private, special, and alternative schools. Regardless, in the face of unambiguous constitutional provisions, the secondary sources must yield to the constitution. If the secondary sources evidence an intent to appropriate the entire ten percent to the public schools, such was not accomplished by the language of the constitution.
As indicated, once it is determined that the constitutional provision is unambiguous, there is no need to evaluate the intent of the framers and voters. However, if that intent is considered, the intent of the framers and voters would be frustrated if the private, special, and alternative schools did not share in the windfall derived from the sale of a portion of the Tobacco Settlement.
Prior to the sale of a portion of the Tobacco Settlement, the State was to receive an income stream paid over a span of years. The right to collect monies in the future from the Tobacco Settlement was accelerated forward to 2002 due to a sale of a portion of the future income stream. Thus, the sale resulted in the future income stream being exchanged for a one-time lump sum payment which resulted in a financial windfall in 2002. Indisputably, the one-time financial windfall is comprised of monies that would otherwise have been paid in a future income stream. Indisputably, the one-time financial windfall is comprised of monies that would otherwise have been paid in the future to the private, special, and potentially the alternative schools. No one, neither the framers of the constitutional provisions at issue nor the voters, anticipated the sale and resulting financial windfall when the constitutional provision was confected and approved.[9]
The constitution does not specifically address the financial windfall realized by the sale. However, there is a clear intent, expressed by the voters in the constitution, that "[f]ifteen percent of monies available for appropriation in any fiscal year from the Education Excellence Fund shall be appropriated ... for distribution on behalf of all children attending [approved] private elementary and secondary schools...." (Emphasis added.) See (C)(3)(a) of § 10.8 quoted in full at footnote 5.
There is a clear intent that "[a]ppropriations shall be made each year" to the special schools. (Emphasis added.) See (C)(3)(b) of § 10.8 quoted in full at footnote 5.
There is a clear intent that "[a]ppropriations may be made" for the alternative schools. See (C)(3)(c) of § 10.8 quoted in full at footnote 5.
Providing a windfall to the public schools would come at the expense of the *1006 schools specified in the constitution, specifically the private schools, the School for the Deaf, the School for the Visually Impaired, the Louisiana Special Education Center in Alexandria, the Louisiana School for Math, Science and the Arts, the New Orleans Center for Creative Arts, the Louis Armstrong High School for the Arts and potentially the alternative schools. But for the sale, the windfall of revenues realized in 2002 would otherwise have been paid over the subsequent years to the private schools, special schools, and alternative schools.
Thus, the intent of the framers and voters expressed in the constitution, that private, special, and alternative schools share in the Tobacco Settlement, would be frustrated by the public schools receiving the windfall resulting from the sale. The intent of the citizens as expressed in the constitution is that all students in Louisiana share in the benefits received as a result of the Tobacco Settlement, not just those students attending public schools. Consequently, if the intent of the framers and voters is considered, the private, special, and alternative schools should share in the 2002 financial windfall.
For the reasons expressed, I would determine that Act No. 26 of 2002 does not violate the provisions of Louisiana Constitution Article VII § 10.8 and was enacted in compliance with the constitution. As such, I would reverse the trial court.
NOTES
[1] As an aid to understanding Plaintiffs' arguments, the following table contains a summary of the appropriations from the Education Excellence Fund as set forth in the original version of House Bill 243 and in the enrolled version of House Bill 243, which became Act 26.

 HB 243-Original HB 243-Enrolled [Act 26]
Private schools $ 382,500 $17,415,000
State-operated schools $ (21,054) $ 142,463
Charter schools $ (54,986) $ 283,479
Public schools $ 98,965,460 $81,430,977

[2] The Intervenors are The Roman Catholic Church of the Archdiocese of New Orleans, The Roman Catholic Church of the Diocese of Baton Rouge, the Diocese of Shreveport, the Diocese of Alexandria, The Roman Catholic Church of the Diocese of Houma-Thibodaux, Catholic High of New Iberia, Notre Dame High School of Acadia, Loyola Education Corporation of Shreveport, The Congregation of St. Joseph Roman Catholic Church of Shreveport, Louisiana, The Congregation of St. John's Roman Catholic Church of the Parish of Caddo, Louisiana, Congregation of Our Lady of the Blessed Sacrament Roman Catholic Church of the Parish of Caddo, the Congregation of Roman Catholic Church of Jesus the Good Shepherd of Ouachita Parish, Louisiana, and The Congregation of St. Joseph's Roman Catholic Church of the Parish of Morehouse.
[3] On July 23, 2002, the state treasurer notified the court that some of the funds subject to the temporary restraining order had previously been transferred. The treasurer stated that the total amount of funds available and being held as a result of the temporary restraining order was $17,444,859.00. In granting Plaintiffs' request for a preliminary injunction, and subsequently a permanent injunction, the district court specified that the injunctions applied only to the $17,444,859.00 held in the state treasury. This ruling has not been challenged by the parties.
[4] Specifically, Governor Foster and Superintendent Picard, along with Intervenors, filed an appeal in this court. The Treasurer of the State of Louisiana, John Neely Kennedy, filed in this court a "Response Brief" in order "to inform the Court that he takes no position on the constitutional issues framed for appeal in this proceeding...."
[5] Although the parties have not raised this issue and have all assumed the applicability of § 10.8, we have chosen to examine this issue for the sake of analytic completeness.
[6] Act No. 1145 of 2001, which enacted the Tobacco Settlement Financing Corporation Act, was passed by more than a two-thirds vote of each house of the legislature.
[7] The amounts appropriated by Act 26 do not equal the entire amount allocated for appropriation from the Education Excellence Fund for Fiscal Year 2001-2002 because Act 26 was a supplemental appropriations bill and some appropriations from the Education Excellence Fund had previously been made by another Act. The previous appropriations are not before this court.
[1] The full text of (A)(1)(d) follows:

For Fiscal Year 2000-2001, Fiscal Year 2001-2002, and Fiscal Year 2002-2003, ten percent of the total monies received in each of those years for credit to the Education Excellence Fund which, notwithstanding the provisions of Subparagraph (C)(1) of this Section, shall be appropriated for the purposes provided in Subsubparagraph (d) of Subparagraph (3) of Paragraph (C) of this Section.
[2] Noteworthy is that public schools are not specifically mentioned in (A)(1)(d); instead, the Education Excellence Fund is specified.
[3] The text of (A)(1)(d) also states: "notwithstanding the provisions of Subparagraph (C)(1)." This provision will be discussed later.
[4] The full text of (C)(3)(d) follows:

Beginning Fiscal Year 2000-2001 and for each fiscal year through the end of Fiscal Year 2006-2007, of the monies available for appropriation after providing for the purposes enumerated in Subsubparagraphs (a), (b), and (c) of this Subparagraph, the following appropriations shall be made to the state superintendent of education for distribution a follows:
(i) Thirty percent of the funds available to be divided equally among each city, parish, and other local school system.
(ii) Seventy percent of the funds available to be divided among each city, parish, and other local school system in amounts which are proportionate to each school's share of the total state share of the Minimum Foundation Program appropriation as contained in the most recent Minimum Foundation Program budget letter approved by the State Board of Elementary and Secondary Education.
[5] The full text of (3)(a), (b) and (c) follows:

(a) Fifteen percent of monies available for appropriation in any fiscal year from the Education Excellence Fund shall be appropriated to the state superintendent of education for distribution on behalf of all children attending private elementary and secondary schools that have been approved by the State Board of Elementary and Secondary Education, both academically and as required for such school to receive money from the state.
(b) Appropriations shall be made each year to the Louisiana School for the Deaf, the Louisiana School for the Visually Impaired, the Louisiana Special Education Center in Alexandria, the Louisiana School for Math, Science and the Arts, the New Orleans Center for Creative Arts and the Louis Armstrong High School for the Arts, after such schools are operational, to provide for a payment to each school of seventy-five thousand dollars plus an allocation for each pupil equal to the average statewide per pupil amount provided each city, parish, and local school system pursuant to Subsubparagraphs (d) and (e) of this Subparagraph.
(c) Appropriations may be made for independent public schools which have been approved by the State Board of Elementary and Secondary Education or any city, parish, or other local school system and for alternative schools and programs which are authorized and approved by the State Board of Elementary and Secondary Education but are not subject to the jurisdiction and management of any city, parish or local school system, to provide for an allocation for each pupil, which shall be the average statewide per pupil amount provided in each city, parish, or local school system pursuant to Subsubparagraphs (d) and (e) of this Subparagraph.
[6] Contrast the permissive language here with the mandatory language of (C)(3)(a) and (b).
[7] The full text of (C)(1) follows:

Appropriations from the Health Excellence Fund, Education Excellence Fund, and TOPS Fund shall be limited to an annual amount not to exceed the estimated aggregate annual earnings from interest, dividends, and realized capital gains on investment of the trust as recognized by the Revenue Estimating Conference. Amounts determined to be available for appropriation shall be those aggregate investment earnings which are in excess of an inflation factor as determined by the Revenue Estimating Conference. The amount of realized capital gains on investment which may be included in the aggregate earnings available for appropriation in any year shall not exceed the aggregate earnings from interest and dividends for that year.
[8] Noteworthy is that (A)(1)(d) does not state "notwithstanding the provisions of (C)(1)(a), (b), and (c)." Such a reference would clearly indicate the private, special, and alternative schools would not receive a share of the ten percent of the total monies received in the specified fiscal years.
[9] In oral reasons for judgment, the trial judge correctly recognized that the sale was not contemplated when the constitutional provision was enacted.