Dear Ms. Baier:
You requested the opinion of this office concerning the 2003 amendments to the Mineral Revenue Audit and Settlement Fund (the "Mineral Fund"), created by La. Const. Art. VII, Sec. 10.5 and statutorily by La.R.S. 39:97
(A). The Mineral Fund governs the allocation of certain revenues received by the State through settlements or judgments resulting from the underpayment to the State of severance taxes, royalty payments, bonus payments, or rentals (the "Mineral Revenues"). Under Sec. 10.5(A), the Treasurer is directed to make allocations from the Mineral Revenues to the Bond Security and Redemption Fund as provided in La. Const. Art.VII, Sec. 9(B), to the political subdivisions of the State as provided in La. Const. Art. VII, Sec. 4(D) and (E), and by La. Const. Art. VII, Secs.10-A, 10.1, 10.2, and 10.3.
Act 1302, with voter approval, amended, inter alia, La. Const. Art.VII, Sec. 10.5(B) and (C) while Act 1195 enacted a corresponding amendment to the statutory provision. Sec. 10.5(B) and (C) now provide in pertinent part:
 "(B) After making the allocations provided for in Paragraph (A), the treasurer shall then deposit in and credit to the Mineral Revenue Audit and Settlement Fund any such remaining revenues. Any revenues deposited in and credited to the fund shall be considered mineral revenues from severance taxes, royalty payments, bonus payments, or rentals for purposes of determining deposits and credits to be made in and to the Wetlands Conservation and Restoration Fund as provided in Article VII, Section 10.2 of this constitution. Any revenues deposited in and credited to the fund shall not be considered mineral revenues for purposes of the Budget Stabilization Fund as provided in Article VII, Section 10.3 of this constitution . . .
 (C) After making the allocations provided for in Paragraph (A). the treasurer shall credit thirty-five million dollars to the Wetlands Conservation and Restoration Fund. and thereafter any monies credited to the fund in any fiscal year may be annually appropriated by the legislature only for the purposes of retirement in advance of maturity through redemption, purchase, or repayment of debt of the state . . .; or to provide for payments against the unfunded accrued liability of the public retirement systems . . .: and for deposit in the Wetlands Conservation and Restoration Fund." (Emphasis added)
The only amendment to Sec. 10.5(B) was to replace the words "Revenue Stabilization/Mineral Trust Fund" with the words "Budget Stabilization Fund". The amendment to Sec. 10.5(C), as underlined in the preceeding paragraph, authorized the use of the Mineral Revenues for the Wetlands Conservation and Restoration Fund (the "Wetlands Fund").
Your question is whether there is a conflict between Sections (B) and (C) of Section 10.5 as both sections begin: "After making the allocations provided for in Subsection A of this Section, the treasurer shall . . .". The Treasurer is then directed to both deposit any remaining Mineral Revenues in the Mineral Fund and to credit $35 million of the Mineral Revenues to the Wetlands Fund. You requested the opinion of this office as to how and where, in any fiscal year, the treasury should disburse any remaining monies after making the allocations provided for in subsection A.
In East Baton Rouge Parish School Bd. v. Foster, 2002-2799 (La. 6/6/03), 851 So.2d 985, the Louisiana Supreme Court set forth the guidelines to interpreting a constitutional provision, in pertinent part as follows:
 "The starting point in the interpretation of constitutional provisions is the language of the constitution itself. Louisiana Mun. Ass'n v. State, 00-0374, p. 5 (La. 10/6/00), 773 So.2d 663, 667. When a constitutional provision is plain and unambiguous, and its application does not lead to absurd consequences, its language must be given effect. Id. at pp. 5-6, 773 So.2d at 667; State ex rel. Guste v. Board of Com'rs of Orleans Levee Dist., 456 So.2d 605, 609 (La. 1984); Bank of New Orleans Trust Co. v. Seavey, 383 So.2d 354, 356 (La. 1980).
 When the constitutional language is subject to more than one reasonable interpretation, however, the determination of the intent of the provision becomes necessary. Louisiana Mun. Ass'n, 00-0374 at p. 6, 773 So.2d at 667. In seeking to ascertain constitutional intent, the same general rules used in interpreting laws and written instruments are followed. Caddo-Shreveport Sales Use Tax Comm'n v. Office of Motor Vehicles, 97-2233, p. 6 (La. 4/14/98), 710 So.2d 776, 780; Radiofone, Inc. v. City of New Orleans, 93-0962, p. 6 (La. 1/14/98), 630 So.2d 694, 698. This court has stated that the function of a court in construing constitutional provisions is to ascertain and give effect to the intent of the people who adopted it. Caddo-Shreveport, 97-2233 at p. 7, 710 So.2d at 780; Radiofone, 93-0962 at p. 6, 630 So.2d at 698. Additionally, we have determined that the understanding that can reasonably be ascribed to the voting population as a whole controls the interpretation. Id. In other cases, however, this court has stated that in construing constitutional provisions, a court should ascertain and give effect to the intent of both the framers of the amendment and of the people who adopted it. See Board of Com'rs of Orleans Levee Dist. v. Department of Natural Resources, 496 So.2d 281, 298 (La. 1986) (on rehearing). All of these principles are correct statements of law. Nevertheless, to harmonize them, we will add that in construing an ambiguous constitutional provision, a court should ascertain and give effect to the intent of both the framers of the provision and of the people who adopted it; however, in the case of an apparent conflict, it is the intent of the voting population that controls. See Arata v. Louisiana Stadium Exposition Dist., 254 La. 579, 225 So.2d 362, 372 (1969)."
The court in East Baton Rouge Parish School Board discussed how to determine the intent of the framers and the voters, as follows in pertinent part:
 ". . . The problem presented by this case, however, is not the proper interpretation of Act 26, but is instead the proper interpretation of La. Const. art. VII, § 10.8 in general and subsection (A)(1)(d) in particular. It is the contemporaneous history surrounding the adoption of La. Const. art. VII, § 10.8, such as the conference committee minutes and the ballot language presented to the public discussed above, that is relevant in determining the intent of the framers and of the voting population as a whole.
 . . . While we do not doubt the recollections of Senators Hainkel and Campbell regarding the history of the adoption of § 10.8, their recollection is at odds with the version of the final bill that ultimately became La. Const. art. VII, § 10.8. As shown by the minutes of the conference committee that proposed the final version of the bill and the ballot language presented to the public, it is clear that the intent of subsection (A)(1)(d) was that the additional ten percent be appropriated solely to the public schools . . . Finally, and perhaps most importantly, of primary concern is the intent of the people who adopted the amendment. Id. In light of the ballot language that clearly indicates the additional ten percent is to be appropriated to the public schools, we find the above discussion among a small number of legislators three years after the adoption of the language at issue cannot serve to evidence an intent contrary to that most reasonably ascribed to the legislators and the voting population as a whole at the time the constitutional provision was adopted." (Emphasis added).
The State Constitution must be interpreted by the same rules as are other laws and, therefore, must be read to accord equal dignity to all its provisions, giving effect to the intent of both the framers and the people who adopted it, thereby avoiding absurd and impractical results. It is a general principle of judicial interpretation that, unlike the federal constitution, a state constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature. in its exercise of the entire legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit. Board ofDirectors of the Louisiana Recovery District v. All Taxpayers, et al.,529 So.2d 384 (La. 1988).
The language of the proposition approved by the voters to amend Sec. 10.5 reads as follows in pertinent part:
 "Requires that thirty-five million dollars annually of monies in the Mineral Revenue Audit and Settlement Fund be deposited in the Wetlands Conservation and Restoration Fund each year and authorizes the legislature to appropriate nonrecurring revenues for certain highway construction and to appropriate monies in the Mineral Revenue Audit and Settlement Fund for deposit in the Wetlands Conservation and Restoration Fund, removes authority to appropriate monies from the Mineral Revenue Audit and Settlement Fund to retire in advance of maturity debt of the Louisiana Recovery District . . ." (Emphasis added)
Giving effect to both Sec. 10.5(B) and (C) as approved by the voters and relying upon the language of the ballot proposition, it is the opinion of this office that after making the allocations required in Sec. 10.5(A), the treasurer should transfer the remainder of the Mineral Revenues to the Mineral Fund in accordance with Sec. 10.5(B). Each year, the treasurer should transfer $35 million from the Mineral Fund to the Wetlands Fund in accordance with Sec. 10.5(C).
Trusting this adequately responds to your request, we remain
Yours very truly,
 CHARLES C. FOTI ATTORNEY GENERAL
 BY: __________________________ MARTHA S. HESS Assistant Attorney General
CCF:MSH:jv