868 So.2d 124 (2003)
LOUISIANA PUBLIC FACILITIES AUTHORITY
v.
ALL TAXPAYERS, PROPERTY OWNERS, CITIZENS OF the STATE OF LOUISIANA AND NONRESIDENTS OWNING PROPERTY OR SUBJECT TO TAXATION THEREIN, and All Other Persons Interested in or Affected in Any Way by the Issuance of Not to Exceed $90,000,000 of Louisiana Public Facilities Authority Revenue Bonds (Tiger Athletic Foundation Project) in One or More Series or by the Execution of the Cooperative Endeavor and Lease Agreement by and Between the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College and Tiger Athletic Foundation with Respect to Improvements to LSU Tiger Stadium.
Donald C. Hodge, Jr.
v.
Board of Supervisors of Louisiana State University and Agricultural and Mechanical College.
Nos. 2003 CA 2738, 2003 CA 2739.
Court of Appeal of Louisiana, First Circuit.
December 23, 2003.
Writ Denied March 11, 2004.
*125 Donald C. Hodge, Jr., Baton Rouge, Appellant In Proper Person.
C. Stokes McConnell, Jr., Michael A. Patterson, Gerald L. Walter, Jr., Brandon K. Black, P. Raymond Lamonica, Baton Rouge, Counsel for Appellees Louisiana Public Facilities Authority and Board of Supervisors of Louisiana State University Agricultural and Mechanical College.
Before: PARRO, PETTIGREW, DOWNING, GAIDRY, and McDONALD, JJ.
PETTIGREW, J.
This is an appeal of a judgment rendered in favor of the Board of Supervisors ("Board") of Louisiana State University Agricultural and Mechanical College ("LSU") and the Louisiana Public Facilities Authority ("the Authority"), declaring valid and legal a bond issuance and related contracts prepared in conjunction with a cooperative endeavor between LSU and *126 the Tiger Athletic Foundation ("Foundation") to make improvements to Tiger Stadium and for the construction of a Football Operations Center, amounting to some $90,000,000.00. In a consolidated suit, filed by an LSU student, a petition for injunction seeking to enjoin a proposed raise in the price of Tiger Stadium football tickets was dismissed. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
On August 21, 2003, a special meeting of the LSU Board was held for the purpose of voting on a new "General Pricing Policy For Home Football Games" for the 2004 football season and thereafter ("general pricing policy"). The new policy was passed. In the general pricing policy, the price of single game football tickets was raised from $32.00 to $36.00, with season tickets to be priced at $252.00 for seven home games and $216.00 for six home games. A previously existing $4.00 surcharge on single tickets and a previously existing season ticket surcharge of either $25.00 or $50.00 per seat per season was discontinued. However, the requirement of a "donation" or "contribution" in support of the LSU athletic department, ranging from $85.00 to $400.00 per seat per year for season tickets, was inserted into the pricing policy.[1]
On September 26, 2003, a "Cooperative Endeavor and Lease Agreement" ("Cooperative Endeavor") was signed by Mark A. Emmert, Chancellor of LSU; William L. Jenkins, President of Louisiana State University System; and R.G. Richard, CEO of the Foundation. The Cooperative Endeavor provided for a lease of the property and facilities at issue from LSU to the Foundation in exchange for the Foundation's paying an annual rental of $25,000.00, and the Foundation's agreement to complete the specified repairs, renovations, and construction projects. The lease term for the ground was to be fifty years, while the lease term for the facilities was to commence on the date of "Substantial Completion" of the improvements and terminate on March 31, 2041, with a renewal option.[2]
In the Cooperative Endeavor, the Foundation agreed to lease the facilities to LSU, excepting a certain number of "Foundation Club Seats," upon payment by LSU of $2,500,000.00 per year beginning on September 1, 2005. In addition to other agreements, provisions, and terms not pertinent to this litigation, the Cooperative Endeavor further provided that the Foundation would arrange for construction of the improvements in accordance with plans and specifications contained therein. It was agreed that construction would commence not later than twelve months from the approval of the plans and specifications or from the effective date of the agreement, whichever was later. The Foundation further agreed not to encumber the property without prior LSU approval, "other than the pledge and assignment of, and grant *127 of security interest in and to the LSU Rent, and the donations, rents, revenues, premiums, and profits derived from the sale of tickets by Foundation in Tiger Stadium and revenues received by Foundation pursuant to Qualified Corporate Sponsorships [corporate scoreboard sponsorships] to secure its obligations relating to the Bonds and to any Credit Enhancement Provider [issuer of letters of credit or bond insurance]."[3]
Financing of the project was evidenced by a "Loan Agreement" between the Authority and the Foundation, as well as by a "Trust Indenture" between the Authority and Bank One, both of which were dated November 1, 2003. In addition, an "Act of Assignment of Pledged Revenue and Security Agreement" was entered into between the Foundation and Hibernia National Bank ("Hibernia"), which included a pledge of revenue generated from Tiger Stadium. The affidavits of Elizabeth St. Paul, Vice President of Hibernia, and LSU President William L. Jenkins, were made a part of the record; these affidavits attested that the validity of the football ticket pricing policy at issue herein and the pledge of that revenue was an integral part of the financing arrangements for the overall project.
Prior to the hearing on this matter, Mr. Hodge, LSU, and the Authority entered into a written "Joint Stipulation of Facts," which was introduced into evidence and revealed the following facts: On August 21, 2003, the LSU Board authorized execution of a Cooperative Endeavor between LSU and the Foundation and authorized Jenkins to do all things necessary to implement the agreement; the board of directors of the Foundation authorized the Cooperative Endeavor; execution of the Cooperative Endeavor will result in more than $55 million in improvements to Tiger Stadium to be constructed by the Foundation; the Foundation will also construct a new West Side Upper Deck; general stadium improvements will be transferred to LSU pursuant to the Cooperative Endeavor; the combined costs to the Foundation will be $67 million; pursuant to the lease agreement, the Foundation and LSU agreed the Foundation will construct a football operations center costing $15 million; over the past three years, the LSU Athletic Department contributed approximately $2.5 million of its revenue to the LSU Board for academic purposes; lease of the completed West Side addition by the Foundation to LSU will be recorded on the financial statements of the LSU Board as an operating lease; as an operating lease, the payment obligation of the LSU Board will not constitute a "net state tax supported debt" under 1993 La. Acts, No. 813, the Debt Limitation Law; the Authority adopted a resolution to authorize issuance of the bonds; an executed copy of the cooperative endeavor was attached to the stipulations; the "Trust Indenture," loan agreement, and assignments were legally approved; there was evidence of requisite publication; the State Bond Commission and the Attorney General's office were properly notified; and all pertinent minutes, associated documents, and proofs thereof were submitted to the court. It was further verbally stipulated on the day of the hearing that, "[t]he authority having been delegated, the LSU Board of Supervisors does not act at formal meetings to give specific approval for each of the following. *128 items: number one, housing rent; number two, concession prices; number three, bookstore merchandise; number four, veterinary services; number five, copy costs; number six, theater tickets; number seven, fees paid by students for pharmacy, laboratory and x-ray services."
Following the November 18, 2003 hearing, the trial court rendered judgment in favor of the Authority in suit number 512,751, validating the bond issuance and LSU ticket pricing policy, and against the plaintiff in suit number 512,930, denying injunctive relief. Mr. Hodge filed the instant appeal, which was assigned expedited status in accordance with La. R.S. 13:5121 et seq.[4] On appeal, Mr. Hodge assigns as error the trial court's finding that the "fee assessed by [LSU] for the right to purchase season tickets, is not a fee as understood by Art. VII, Sec. 2.1 of the Louisiana State Constitution."

DISCUSSION
The constitutional provision at issue in this dispute is La. Const. Art. VII, § 2.1, which provides as follows:
§ 2.1. Fees and Civil Fines; Limitation
Section 2.1. (A) Any new fee or civil fine or increase in an existing fee or civil fine imposed or assessed by the state or any board, department, or agency of the state shall require the enactment of a law by a two-thirds vote of the elected members of each house of the legislature.
(B) The provisions of this Section shall not apply to any department which is constitutionally created and headed by an officer who is elected by majority vote of the electorate of the state.[5] [Emphasis added.]
Louisiana Constitutional Article VII, § 2.1 was enacted by 1995 La. Acts, No. 1324, § 1, was approved by the electorate on October 21, 1995, and became effective November 23, 1995. At issue in the present dispute is whether the word "fee" includes the cost charged by LSU for football tickets.
As there is no jurisprudence interpreting this 1995 constitutional provision, the *129 issue before this court is res nova among the courts of Louisiana. However, the Louisiana Attorney General has opined that charges by LSU for admittance to extracurricular activities do not constitute "fees" within the meaning of La. Const. Art. VII, § 2.1, reasoning as follows:
The Louisiana State University System is created and exists for the sole purpose of providing public higher education to the citizens of this State. This is its governmental function. Those charges which are assessed for the provision of higher education to LSU students would be considered fees for purposes of Article 7, Section 2.1. Any charges which are for services or products which are not directly a part of the delivery of an education are not considered fees. Thus, ... it is the opinion of this office that student housing, food services, book store merchandise, medical or veterinary services and admittance to extracurricular events are not directly a part of the governmental function of providing higher education, thus, charges for these goods and services would not be considered fees.
La. Atty. Gen. Op. No. 01-165 (May 4, 2001). See also La. Atty. Gen. Op. No. 96-353 (October 9, 1996).
The trial court, in ruling in favor of appellees, cited the attorney general opinion, finding the position espoused therein persuasive. The trial court emphasized the attorney general's view that "fees" do not include charges for auxiliary, self-generating, extra-curricular activities at LSU. The trial court further adopted the rationale of the attorney general that since the governmental function of LSU is to provide higher education to citizens of this state, charges for services not directly a part of the delivery of an education are not considered fees for purposes of La. Const. Art. VII, § 2.1.
The interpretation of constitutional provisions was recently discussed by the supreme court in East Baton Rouge Parish School Bd. v. Foster, 2002-2799, pp. 16-17 (La.6/6/03), 851 So.2d 985, 996, wherein it was stated:
The starting point in the interpretation of constitutional provisions is the language of the constitution itself. When a constitutional provision is plain and unambiguous, and its application does not lead to absurd consequences, its language must be given effect.
When the constitutional language is subject to more than one reasonable interpretation, however, the determination of the intent of the provision becomes necessary. In seeking to ascertain constitutional intent, the same general rules used in interpreting laws and written instruments are followed. This court has stated that the function of a court in construing constitutional provisions is to ascertain and give effect to the intent of the people who adopted it. Additionally, we have determined that the understanding that can reasonably be ascribed to the voting population as a whole controls the interpretation. In other cases, however, this court has stated that in construing constitutional provisions, a court should ascertain and give effect to the intent of both the framers of the amendment and of the people who adopted it. All of these principles are correct statements of law. Nevertheless, to harmonize them, we will add that in construing an ambiguous constitutional provision, a court should ascertain and give effect to the intent of both the framers of the provision and of the people who adopted it; however, in the case of an apparent conflict, it is the intent of the voting population that controls. [Citations omitted.]
*130 The term "fee," as used in La. Const. Art. VII, § 2.1, was not defined in the Louisiana Constitution or elsewhere in the laws of Louisiana. The use of the word fee is nevertheless used to address a variety of monetary charges imposed under state law, including: filing fees, license fees, recordation fees, registration fees, inspection fees, membership fees, finance servicing fees, airport use fees, attorney fees, etc.
The definition of "fee" as found in Black's Law Dictionary (5th ed.1979), is as follows, in pertinent part:

A charge fixed by law for services of public officers or for use of a privilege under control of government. A recompense for an official or professional service or a charge or emolument or compensation for a particular act or service. A fixed charge or perquisite charged as recompense for labor, reward, compensation, or wage given to a person for performance of services or something done or to be done. [Citations omitted; emphasis added.]
Arguably, admission to Tiger Stadium is a privilege under control of the State of Louisiana by means of the rules, regulations, and charges imposed by LSU for the right to occupy a specified seat in the stadium in order to watch a football game. Nevertheless, were this court to interpret La. Const. Art. VII, § 2.1 as including within its purview the amount charged for a football ticket as a "fee," then many other similar services and/or privileges would fall within the meaning of a fee as well. Although appellees' argument that goods such as textbooks, pencils, and popcorn would thereby be included is overly broad, at the very least other admission costs for access to governmental controlled facilities would then become implicated as "fees"; such as, the admission price of parks, zoos, museums, theatres, and the like.
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. Tarver v. E.I. Du Pont De Nemours and Co., 93-1005, p. 3 (La.3/24/94), 634 So.2d 356, 358. See also Bunch v. Town of St. Francisville, 446 So.2d 1357, 1360 (La.App. 1 Cir.1984).
Because of the many and varied uses of the word "fee" in the laws of this state, it is unclear from a plain reading of La. Const. Art. VII, § 2.1 exactly what meaning was ascribed to the word therein. In such a case, when the constitutional language is subject to more than one reasonable interpretation, the supreme court directs the courts to attempt to determine and give effect to the intent of both the framers of the amendment and of the people who adopted it. Foster. 2002-2799 at 16, 851 So.2d at 996.
Every bill shall contain a brief title indicative of its object. La. Const. Art. III, § 15. Thus, the title and preamble to a statute properly may be consulted to determine legislative intent. Hoag v. State ex rel. Kennedy, XXXX-XXXX, p. 10 (La.App. 1 Cir. 11/20/02), 836 So.2d 207, 216-217, writ denied, XXXX-XXXX (La.3/28/03), 840 So.2d 570. The legislative history of a statute and related legislation also provides a particularly helpful guide in ascertaining the intent of a statute. Hoag, XXXX-XXXX at 10, 836 So.2d at 217.
As previously indicated, La. Const. Art. VII, § 2.1 was enacted by 1995 La. Acts, No. 1324, which reads as follows:
HOUSE BILL No. 320 BY REPRESENTATIVE GUNN AND JENKINS A JOINT RESOLUTION
Proposing to add Article VII, Section 2.1 of the Constitution of Louisiana, to provide *131 that any new fee or civil fine or existing fee or civil fine imposed or assessed by the state or any board, department, or agency of the state must receive at least a two-thirds vote of each house of the legislature; to provide for submission of the proposed amendment to the electors; and to provide for related matters.
Section 1. Be it resolved by the Legislature of Louisiana, two-thirds of the members elected to each house concurring, that there shall be submitted to the electors of the state of Louisiana, for their approval or rejection in the manner provided by law, a proposal to add Article VII, Section 2.1 of the Constitution of Louisiana, to read as follows:
§ 2.1. Fees and Civil Fines; Limitation
Section 2.1. (A) Any new fee or civil fine or increase in an existing fee or civil fine imposed or assessed by the state or any board, department, or agency of the state shall require the enactment of a law by a two-thirds vote of the elected members of each house of the legislature.
B. The provisions of this Section shall not apply to any department which is constitutionally created and headed by an officer who is elected by majority vote of the electorate of the state.
Section 2. Be it further resolved that this proposed amendment shall be submitted to the electors of the state of Louisiana at the gubernatorial primary election to be held in 1995.
Section 3. Be it further resolved that on the official ballot to be used at said election there shall be printed a proposition, upon which the electors of the state shall be permitted to vote FOR or AGAINST, to amend the Constitution of Louisiana, which proposition shall read as follows:
To provide that any new fee or civil fine or increase in an existing fee or civil fine imposed or assessed by the state or any board, department, or agency of the state must receive at least a two-thirds vote of the elected members of each house of the legislature. To exempt departments which are constitutionally created and headed by a statewide elected official. (Adds Article VII, Section 2.1)
In examining the intent of the legislature, a court may take judicial notice of the journals of the houses of the state legislature, as well as records of legislative committee proceedings, where preserved, as they are a matter of public record. See University Properties Corp. v. Fidelity Nat. Bank of Baton Rouge, 500 So.2d 888, 906 n. 5 (La.App. 1 Cir.1986), writ denied, 501 So.2d 762 (La.1987) See also Heinhuis v. Venture Associates, Inc. of Louisiana, 558 So.2d 1244, 1247 (La.App. 1 Cir.), writs denied, 559 So.2d 1369, 1385 (La. 1990).
Originally, Act 1324 (House Bill 320) was an amendment to La. Const. Art. VII, § 2, which provides:
§ 2. Power to Tax; Limitation
Section 2. The levy of a new tax, an increase in an existing tax, or a repeal of an existing tax exemption shall require the enactment of a law by two-thirds of the elected members of each house of the legislature.
The text of original House Bill 320 was as follows:
§ 2. Power to Tax; Limitation; Fees and Fines

Section 2. (A) The levy of a new tax, an increase in an existing tax, or a repeal of an existing tax exemption shall require the enactment of a law by twothirds *132 of the elected members of each house of the legislature.

(B) Any new fee or fine or increase in an existing fee or fine shall require the enactment of a law by a two-thirds vote of the elected members of each house of the legislature.[6] [Original underscoring indicated proposed amendment.]
However, the final version of the bill separated the proposed amendment into a separate sub-section, 2.1.
The bill was referred to both the Committee on Ways and Means and the Civil Law and Procedure Committee. Legislative transcription of the April 25, 1995 discussions before the Committee on Ways and Means reflected, in pertinent part:
Representative Gunn stated that according to research provided by the legislative fiscal officer, fees have increased from $426 million to $933 million since 1988. He said that very few of those increases were voted on by the legislature; the fees were imposed through the Administrative Procedure Act.
Representative Reilly said that he supported the legislation. He said that fees should have the same legislative review as taxes, especially due to the fact that it is often difficult to distinguish between a fee and a tax.
Representative Landrieu submitted that the problem with taxes, according to some citizens, is that taxes are being used to subsidize government programs for people who will not pay for themselves, and what really should be done is to go on a "pay as you go" basis. He said that the "pay as you go" basis is the idea behind fees. Representative Landrieu said that it is inconsistent to treat fees and taxes in the same manner.
Representative Odinet offered amendments... [and] said that this would allow the legislature to have oversight over all fees.
Representative Copelin commented on emergency rule provisions in the Administrative Procedure Act. He said that often after an emergency rule is put into effect, the permanent fee becomes effective without review.
Legislative transcription of the May 1, 1995 discussion before the Civil Law and Procedure Committee reflected, in pertinent part:
In response to questioning by Representative Bowler, Representative Gunn said the proposed legislation would apply to all fees imposed by the state.
This court has further reviewed the audiotapes of these legislative committee meetings, which are public records. These audiotapes revealed the legislative transcriptions to be accurate and reflective of the discussions held before these committees regarding Act 1324. An additional point made clear from the audiotapes was expressed by Representative Landrieu, who distinguished a fee from a tax by explaining that the purpose of a fee is to place the cost burden on the citizen receiving a service for which a fee is imposed, rather than on the general taxpayer by means of taxes.
The summary of the discussions reflect that the legislature desired to impose legislative control on fees charged in connection with government "programs" for services to citizens that might otherwise be provided by the government and funded by taxation. The legislators were concerned *133 that an excess number of these fees were being imposed or increased by means of emergency procedures provided for under the Administrative Procedure Act, La. R.S. 49:950 et seq. ("APA"); and because these fees were likened to taxes, the legislature felt their implementation and/or increase should be controlled by the legislature.
Laws in pari materia on the issue of fees can be found in La. R.S. 49:951-971 of the APA. By means of 1987 La. Acts, No. 240, language was added to amend and reenact R.S. 49:951 and 968, and to enact R.S. 49:968.1 of the APA, to exclude proposed agency fee adoptions, increases, and decreases from inclusion within agency rule-making authority, to provide for legislative oversight of proposed agency fee actions, to provide for legislative rejection of proposed fee adoptions, increases, and decreases and to provide for related matters. Further amendment of these provisions to provide greater oversight of agency fee assessment was enacted by 1995 La. Acts, No. 1057. APA provisions currently addressing agency fees include La. R.S. 49:951(6) and (7), which provide:
(6) "Rule" means each agency statement, guide, or requirement for conduct or action, exclusive of those regulating only the internal management of the agency and those purporting to adopt, increase, or decrease any fees imposed on the affairs, actions, or persons regulated by the agency, which has general applicability and the effect of implementing or interpreting substantive law or policy, or which prescribes the procedure or practice requirements of the agency. "Rule" includes, but is not limited to, any provision for fines, prices or penalties, the attainment or loss of preferential status, and the criteria or qualifications for licensure or certification by an agency. A rule may be of general applicability even though it may not apply to the entire state, provided its form is general and it is capable of being applied to every member of an identifiable class. The term includes the amendment or repeal of an existing rule but does not include declaratory rulings or orders or any fees.
(7) "Rulemaking" means the process employed by an agency for the formulation of a rule. Except where the context clearly provides otherwise, the procedures for adoption of rules and of emergency rules as provided in R.S. 49:953 shall also apply to adoption of fees. The fact that a statement of policy or an interpretation of a statute is made in the decision of a case or in an agency decision upon or disposition of a particular matter as applied to a specific set of facts involved does not render the same a rule within this definition or constitute specific adoption thereof by the agency so as to be required to be issued and filed as provided in this Subsection. [Emphasis added.]
The expressed purpose of La. R.S. 49:968(A) is "to provide a procedure whereby the legislature may review the exercise of rule-making authority and the adoption, increasing, or decreasing of fees, extensions of the legislative lawmaking function, which it has delegated to state agencies." The issue of agency fee assessment is further addressed in La. R.S. 49:971, wherein agencies are directed to submit a proposed fee adoption, increase, or decrease to specified legislative committees for review.
Though the term "fee" is not specifically defined in the APA, we can glean from La. R.S. 49:951(6) that "fees" are charges "imposed on the affairs, actions, or persons regulated by the agency." (Emphasis added.) It is also important to note the provision in La. R.S. 49:951(7) extending *134 application of the APA to "the procedures for adoption of rules and of emergency rules as provided in R.S. 49:953 shall also apply to adoption of fees" "[e]xcept where the context clearly provides otherwise." (Emphasis added.)
Also pertinent to this discussion are other laws respecting LSU, both currently and in terms of the historical treatment of LSU by the legislature.
The responsibility in the legislature for the education of the people of this state, by the establishment and maintenance of a public educational system, is provided by La. Const. Art. VIII, § 1. With respect to higher education, the Board of Regents was created by La. Const. Art. VIII, § 5 to manage the following functions of all public postsecondary education: to exercise budgetary responsibility; to approve, disapprove, modify, revise, or eliminate an existing or proposed degree program, department of instruction, division, or similar subdivision; to study the need for and feasibility of creating a new institution of postsecondary education, including modifying degree programs, merging institutions of postsecondary education, establishing a new management board, or transferring a college or university from one board to another; to formulate and make timely revision of a master plan for postsecondary education that shall include a formula for equitable distribution of funds to the institutions of postsecondary education; to require that every postsecondary education board submit to it an annual budget proposal for operational needs and for capital needs of each institution under the control of each board; submit its budget recommendations for all institutions of postsecondary education in the state; and recommend priorities for capital construction and improvements.
It was specifically provided in La. Const. Art. VIII, § 5 that powers of management over public institutions of postsecondary education not specifically vested by Section 5 in the Board of Regents are reserved to the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, the Board of Supervisors of Southern University and Agricultural and Mechanical College, the Board of Trustees for State Colleges and Universities, the Board of Supervisors of Community and Technical Colleges, and any other such board created pursuant to this Article, as to the institutions under the control of each. Further, La. R.S. 17:3130(A) similarly provides:
All powers of management over public institutions of higher education not specifically vested in the Board of Regents by Article VIII, Section 5 of the Constitution of Louisiana, are reserved to the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, the Board of Supervisors of Southern University and Agricultural and Mechanical College, the Board of Supervisors of Community and Technical Colleges, and the Board of Trustees for State Colleges and Universities, as to the institutions under the control of each.
More specifically, La. R.S. 17:1552 vests the Board "with full authority to determine the location of and acquire the land and buildings deemed necessary for the establishment of such branch."
Even though the Board of Regents is given ultimate budgetary and curricular control by La. Const. Art. VIII, § 1, all other decision-making responsibility is retained in the LSU Board. This deference to LSU's self-governance is rooted in state history. The supreme court in Roy v. Edwards, 294 So.2d 507 (La.1974), recognized the state's historical tradition of providing autonomy to LSU, citing its prior opinion of Student Government Association *135 of L.S.U. v. Board of Supervisors, 262 La. 849, 264 So.2d 916 (1972), wherein it was stated:
In his 1940 message to the Legislature, the Governor of Louisiana recommended legislation `which will guarantee a depoliticalization of our ... universities.' Later in the message, he noted that Louisiana State University had been `the storm center' of a politicalized educational system. (footnote omitted)
To carry out this recommendation, four members of the Senate introduced a Joint Resolution amending Article XII, Section 7 of the Constitution vesting the `direction, control, supervision and management' of the affairs of the University in the Board of Supervisors. Adopted by the legislature as Act 397 of 1940, this amendment to our Constitution was ratified by the People in general election. It is quite clear that the purpose of this amending, in keeping with the executive recommendation, was to remove the administration of the daily affairs of the University from both the Governor and Legislature and place them under a non-political board.
Act No. 668 of 1968 amending Section 7 fortifies the above construction. To provide for the Louisiana Coordinating Council for Higher Education, the constitutional amendment was enacted creating the Council and defining its powers. The following words were added at the beginning of the section: `Except as otherwise provided in the Section ...' This means, in context, that no governmental authority other than the Coordinating Council for Higher Education (created by Subdivision C, added to Section 7 by the 1968 amendment) can intrude into the administration of the affairs of the University. Under the terms of the amendment, even the right of the Coordinating Council to do so is severely limited.
Our interpretation that the intent of the constitution is to grant exclusive administrative power to the Board of Supervisors of Louisiana State University....
The Roy court had before it for consideration 1972 La. Acts, No. 712, which purported to enact La. R.S. 17:3121 et seq., which would have transferred control from LSU's Board to a newly-created governing board for all of the state's institutions of higher learning. This act was declared unconstitutional by the supreme court in Roy, 294 So.2d at 510, ruling as follows:
We do not find that Section 32 of Article III of the Constitution authorizes the enactment of a legislative act which attempts to consolidate and merge the direction, supervision and management of Louisiana State University by the L.S.U. Board which derives its authority from Section 7(A) of Article XII of the Constitution. Act 397 of 1940 amended Section 7 of Article XII of the Constitution. It provided in no uncertain terms that Louisiana State University `shall be under the direction, control, supervision and management' of the L.S.U. Board. The 1968 amendment to Section 7 of Article XII added at the beginning of the Section the words: `Except as otherwise provided in this Section.' These words are clear and unambiguous and mean exactly what they say. The L.S.U. Board has exclusive authority over the affairs of the University except as provided in Section 7 of Article XII of the Constitution.
Therefore, there is no provision in the Constitution or otherwise, except as contained in Section 7 of Article XII, authorizing the legislature to pass a statute that conflicts with the complete autonomy of the L.S.U. Board as provided in Section 7(A) of said Article. Furthermore, *136 Section 7 of Article XII contains no provision authorizing the legislature to merge and consolidate the L.S.U. Board with any other board or commission. Hence, Act 712 of 1972 is in direct conflict with Section 7(A) of Article XII insofar as it attempts to abolish the L.S.U. Board and to transfer all direction, control, supervision and management of the University by the L.S.U. Board to a new Board of Regents. To this extent, the act is clearly unconstitutional.
Historically, this state has given autonomy to its colleges and universities to manage their own affairs. No mention was made during discussion in the House committee meetings that LSU's extracurricular activities and charges would be implicated in the passage of La. Const. Art. VII, § 2.1. The intent seemed to be to place legislative control only on fees charged by traditional government agencies providing services to and/or regulating citizens. Due to the high profile nature of LSU football, we believe any inclination of the legislature toward imposing the requirements of La. Const. Art. VII, § 2.1 on LSU's extracurricular programs would have engendered some comment during the legislative hearings.
While we are unable to definitively ascertain the intent of the voters who adopted La. Const. Art. VII, § 2.1, we believe the average person, upon reading the proposed amendment, had in mind the traditional fees assessed by state governmental agencies, departments, and boards acting in their roles of regulating activities of and providing services to the citizens of Louisiana.
Thus, we agree, as did the trial court, with the reasoning of the attorney general that the legislature has evidenced no intent to have oversight over "fees" with respect to LSU, other than those fees directly connected with LSU's principal governmental function of providing higher education to the citizens of this state. Accordingly, we hold that the price charged by LSU for admission to football games in Tiger Stadium does not constitute a "fee" for purposes of La. Const. Art. VII, § 2.1.[7]

CONCLUSION
For the reasons assigned herein, the judgment of the trial court is affirmed. All costs of this appeal are to be borne by appellant, Donald C. Hodge, Jr.
AFFIRMED.
DOWNING, J., dissents and assigns reasons.
DOWNING, J., dissents and assigns reasons.
In the matter before us, the majority appears to rule that the ticket surcharges approved by the Louisiana State University Board of Supervisors are fees, but not the type of fee addressed in La. Const. art. VII, § 2.1, which requires any new "fee" to be approved by a two-thirds vote of the legislature.
As the trial court concluded, the word, "fee," is not ambiguous. The majority here just does not seem to believe the voters meant what they said, or said what they meant, when they adopted La. Const. art. VII, § 2.1. And perhaps they did not. I lack the prescience to know what the voters meant. But, as the majority states, where a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. Tarver v. E.I. Du Pont De *137 Nemours and Co., 93-1005, p. 3 (La.3/24/94), 634 So.2d 356, 358.
I agree with the trial court that no ambiguity exists in the meaning of the word "fee;" it is the charge paid for a service rendered by a governmental entity or for the use of a privilege under the control of a governmental entity. The application of this meaning does not lead to absurd consequences. This application will merely maintain the status quo. In contrast to that definition is the "price" paid for goods, such as books, food, housing, and the like; such tangible commodities are purchased for a "price" not a "fee." Tuition is a fee that is paid for the educational services of the university.
To the extent that LSU football tickets have a face value of $36, representing the admission price to the stadium for viewing of a football game, the tickets are commodities purchased for price, not a "fee." However, what is being purchased by the "donation," required in addition to the face value of the $36 football admission ticket, is an intangible right to sit in a particular location within the stadium for the duration of the football season. In that sense, LSU controls who sits where within Tiger Stadium during football games. Such a payment is made for use of a privilege under control of LSU and is, therefore, a "fee" within the meaning of La. Const. Art. VII, § 2.1.
I am reminded of the following quotation from `Through the Looking Glass,' Chapter VI, by Lewis Carroll:
"When I use a word", Humpty Dumpty said, "it means just what I choose it to meanneither more nor less."
"The question is," said Alice, "whether you can make words mean so many different things."
"The question is," said Humpty Dumpty, "which is to be masterthat's all."
See M. Gardner, The Annotated Alice (New York: New American Library, © 1960), 269, cited in McGee v. Police Jury of Caddo Parish, 66 So.2d 408, 413 (La. App. 2 Cir.1953)
The plain language of La. Const. art. VII, § 2.1 may become a source of vexation for the various state boards, departments and agencies and to the legislature, but it is not ambiguous. Accordingly, the LSU Board of Supervisors cannot constitutionally impose this fee without a two-thirds vote of the legislature. Consequently, I would find that the trial court erred in failing to require LSU to meet the requirement of La. Const. Art. VII, § 2.1 with respect to the "donations" required to be paid under the LSU stadium general pricing policy for season tickets and would reverse that portion of the trial court judgment.
As appellant has not appealed the finding of validity as to the bond issuance, we are unable to review that ruling of the trial court, and the judgment as to the bond issuance has become final under La. R.S. 13:5129.
NOTES
[1] LSU asserts that the "donation" format was used, rather than incorporating the entire cost of season tickets into the face value of the tickets, to enable ticket holders to claim the benefit of 26 U.S.C. § 170(1), which allows eighty percent of any amount paid to an institution of higher education for the right to purchase tickets to an athletic event in the athletic stadium of the institution to be treated as a charitable donation for federal income tax purposes. (Any amount paid to purchase the ticket is treated separately).
[2] LSU was given the option of terminating the facilities lease when the bonds became legally defeased or paid in full, and it was agreed the Cooperative Endeavor would remain in effect until the bonds became legally defeased or paid in full.
[3] The Cooperative Endeavor also included a provision for liquidated damages to be paid by the Foundation to LSU, in the event substantial completion of the facilities was not completed before the first home game of the 2005 LSU varsity football season. The amount of liquidated damages was stated asbeing either revenue lost because of the lack of completion should home games be played in the stadium or the out-of-pocket costs and losses occasioned by LSU playing home games in another stadium.
[4] In any action affecting the validity of governmental bonds, the provisions of La. R.S. 13:5121 through 13:5129" supercede all other acts and statutes on the subject." La. R.S. 13:5122. Pursuant to La. R.S. 13:5128, the appellant has twenty days from the date of the trial court judgment to have the record certified to the appellate court and to file his appellate brief; the appellee has fourteen days in which to file a reply brief; the case shall be heard no later than seven days thereafter; and the appellate court must render a decision within the seven day period following the hearing.
[5] We note that Paragraph (B) is inapplicable in this case. Even though the Board of Regents and the LSU Board of Supervisors are part of the Department of Education under La. R.S. 36:651(D), the Department of Education is not a constitutionally created department. It is created by La. R.S. 36:642. The only constitutionally created departments are: the Department of State (Art. IV, § 7); the Department of Justice (Art. IV, § 8); the Department of Treasury (Art. IV, § 9); the Department of Agriculture (Art. IV, § 10); the Department of Insurance (Art. IV, § 11); the Department of Elections and Registration (Art. IV, § 12); and the Department of State Civil Service (Art. X, § 6). The remaining thirteen of the twenty executive departments allowed under La. Const.Ast. Art. IV, § 1 and La. Const. Art. XIV, § 6 are enumerated in La. R.S. 36:4 as follows, the Department of Economic Development; the Department of Culture, Recreation and Tourism; the Department of Environmental Quality; the Department of Health and Hospitals; the Department of Labor; the Department of Natural Resources; the Department of Public Safety and Corrections; the Department of Revenue; the Department of Social Services; the Department of Transportation and Development; the Department of Wildlife and Fisheries; the Department of Education; and the Department of Public Service.
[6] Later changes included: "fine" to "civil fine;" "two-thirds" to "two-thirds vote;" and, the addition of the following clause: "imposed or assessed by the state or any board, department, or agency of the state."
[7] We limit our holding herein to the narrow circumstances presented for our review.