JOHNSON, Justice.
 
 [1]
 

 hWe granted this writ application involving Louisiana’s motion picture investor tax credit to address the correct interpretation of La. R.S. 47:6007, specifically as amended by Act 456, Section 3(C) of the 2007 Regular Session of the Louisiana Legislature (“Act 456”). The issue raised is whether Section 3(C) of Act 456 provides a time limitation for expenditures which would qualify for tax credits such that no tax credits can be earned on expenditures incurred after January 1, 2010.
 

 For the reasons that follow, we reverse the decision of the court of appeal, and hold that Section 3(C) of Act 456 provides that no tax credits may be earned on expenditures incurred after January 1, 2010.
 

 FACTS AND PROCEDURAL HISTORY
 

 The State of Louisiana provides for certain motion picture investor tax credits, including tax credits for “State-certified infrastructure projects,” set forth in La. R.S. |247:6007. Seeking to take advantage of these tax credits, Red Stick Studio Developments, L.L.C. (“Red
 
 *183
 
 Stick”) submitted an application for a State-certified infrastructure project comprised of full service motion picture production and post production facilities totaling $665,500,000
 
 [2]
 
 on February 27, 2007. At the time Red Stick submitted its application, a “State-certified infrastructure project” was defined as “an infrastructure project approved by the Governor’s Office of Film and Television Development and the Department of Economic Development. The term ‘infrastructure project’ shall not include movie theaters or other commercial exhibition facilities.” La. R.S. 47:6007(B)(9) (2005). The definition of “State-certified infrastructure project” was revised by Act 456 to “a film, video, television, and digital production and postproduction facility, and movable and immovable property and equipment related thereto, or any other facility which supports and is a necessary component of such proposed state-certified infrastructure project, all as determined and approved by the office, the secretary of the Department of Economic Development, and the division of administration under such terms and conditions as are authorized by this Section. The term ‘infrastructure project’ shall not include movie theaters or other commercial exhibition facilities.” La. R.S. 47:6007(B)(12) (2007).
 

 The Louisiana motion picture investor tax credit program is administered by the Office of Entertainment Industry Development (“OEID”),
 
 [3]
 
 an office within the State’s Department of Economic Development (“DED”). Red Stick’s application and fee were submitted in accordance with the requirements of La. R.S. 47:6007 (2005), |swhich generally required an applicant to file an application for motion picture investor tax credits with the OEID, and obtain approval of the project from the DED, OEID, and the Department of Administration (“DOA”) in order to receive an initial certification letter from the State approving the project as a State-certified infrastructure project.
 
 [4]
 

 At the time Red Stick filed its application with the State, La. R.S. 47:6007 generally provided for a tax credit of twenty-five percent of the base investment, and allowed an additional fifteen percent tax credit until January 1, 2008. Thus, the available tax credits totaled forty percent. However, during the 2007 Regular Session, while Red Stick’s application was pending, the Louisiana Legislature enacted Act 456, which amended La. R.S. 47:6007 to impose certain limits on-these tax credits. Act 456 included a “grandfather clause” relative to applications filed
 
 *184
 
 on or before August 1, 2007. Section 3(C) of Act 456 provides:
 

 An application for an infrastructure project filed on or before August 1, 2007, shall have twenty-four months from the date of approval of the rules or January 1, 2008,
 
 [5]
 
 whichever is earlier, in which to qualify for the forty percent tax credits earned on expenditures. Tax credits on infrastructure projects shall be considered earned in the year in which expenditures are made, provided that a minimum of twenty percent or ten million dollars of the total base investment provided for in the initial certification that is unique to film production infrastructure shall be expended before infrastructure tax credits can be earned on expenditures. The payment of tax credits may extend beyond or be made after the year expenditures are made. (Emphasis added)
 

 |4Red Stick’s application proceeded through the State’s review and approval process, and Red Stick and the State negotiated terms and conditions relative to the proposed project. On August 27, 2007, the State issued an Initial Certification Letter to Red Stick for its proposed project. However, this letter also included paragraph (ii), containing the following language: “[S]ince this application was filed on or before August 1, 2007, the applicant shall have until January 1, 2010 to earn tax credits on this project.” Red Stick disagreed with the language in paragraph (ii), contending the State had confused “earning the credits” with “qualifying to earn the credits,” contrary to the language of Section 3(C).
 

 Red Stick filed a Petition for Writ of Mandamus on November 13, 2008, asking the court to direct the State to remove the requirements contained in paragraph (ii) of the Initial Certification Letter and either not replace them or replace them with language taken directly from Section 3(C). Red Stick amended its petition for Mandamus, seeking a declaratory judgment that Section 3(C) does not provide a time limitation for expenditures which would qualify for tax credits and that tax credits may be earned on expenditures beyond January 1, 2010. Red Stick took the position that as long as it received the Initial Certification Letter, and made the minimum spend (i.e., twenty percent or $10 million) within twenty-four months of January 1, 2008 (i.e., January 1, 2010), it is entitled to forty percent tax credits on all expenditures until the project is completed. The State asserted that Red Stick is only entitled to forty percent tax credit on expenditures made by January 1, 2010, and entitled to no tax credits after that date.
 

 On December 3, 2008, the parties entered into a stipulation pursuant to which the State provided Red Stick with a new Initial Certification Letter, subsequently issued on January 14, 2009, and replaced paragraph (ii) of the original letter with [ 5language citing Section 3(C) of Act 456. The parties further agreed that if a final judgment in the pending action declares, or if a future statutory amendment or enactment by the legislature provides, that Section 3(C) of Act 456 does not provide a time limitation for expenditures which would qualify for tax credits, and that tax credits may be earned on expenditures beyond January 1, 2010, then Red Stick shall be entitled to earn tax credits on this project for expenditures during a period of the lesser of sixty months from the date of final judgment or effective date of legislation, or seventy-eight months from the
 
 *185
 
 date of this initial certification letter. The writ of mandamus was dismissed with prejudice.
 

 Red Stick’s declaratory judgment action came to trial on March 10, 11, 12, 13 and 16, 2009. The parties presented extensive evidence relative to Red Stick’s application process and the legislative history of Act 456, including testimony of various legislators and other witnesses regarding their understanding of Section 3(C) and legislative intent. Following trial, the trial court ruled in favor of Red Stick, finding the statute was clear and unambiguous and that Red Stick qualified for the tax credits when it received its pre-certification letter and made the minimum spend. The trial court held that Red Stick had from that point until it finishes the project to claim the forty percent tax credit. The stipulation between the parties was also made part of the judgment. Because it found the statute to be clear and unambiguous, the trial court stated it was not required to look to legislative intent. However, the court went on to note that even if it were to look at legislative intent, it was embodied in the testimony of Taylor Townsend, Chairman of the House and Ways Committee who authored Act 456 and supported Red Stick’s position.
 

 The State appealed the trial court’s ruling regarding the interpretation of Section 3(C) and also challenged the trial court’s ruling allowing legislators and nonjlegisla-tors6 to give testimony regarding their interpretation of the statute and legislative intent. The court of appeal affirmed the trial court, finding that Section 3(C) of Act 456 is clear and unambiguous, and its application does not lead to absurd consequences.
 
 [6]
 
 The court of appeal agreed with the trial court’s determination that the words “qualify for” as they are used in Section 3(C) mean that an application filed on or before August 1, 2007, must (1) apply for and receive its Initial Certification Letter and (2) spend a minimum of twenty percent or $10 million of the total base investment provided for in the Initial Certification Letter that is unique to film production infrastructure before January 1, 2010. Thereafter, an applicant is qualified to earn forty percent infrastructure tax credits for the life of the project.
 

 In a footnote, the court of appeal stated that if it were to look past the language of Act 456 and consider other evidence of record in search of the intent of the Legislature, its conclusion would remain the same, i.e., that the Legislature passed Act 456 with no deadline for incurring expenditures for “grandfathered projects.” Noting the full record made by the trial court, the court of appeal found the Legislature intended to establish a minimum expenditure of $10 million or twenty percent of the total base investment to be expended within the twenty-four month time period before a project is able to earn any tax credits. Moreover, the court of appeal found no error in the trial court’s decision to allow numerous witnesses, including legislators, to testify concerning their interpretation of Section 3(C), citing La. R.S. 24:177.
 
 [7]
 
 The court of appeal noted that
 
 *186
 
 La. R.S. 24:177 enumerates what [7“shaII not constitute proof or indicia of legislative intent,” and there is no prohibition on the use of trial testimony of legislators, or members of the executive branch.
 

 The State of Louisiana
 
 [8]
 
 filed a writ application with this Court, which we granted.
 
 [9]
 

 DISCUSSION
 

 Tax credits for motion picture investors in Louisiana were first provided for in 1 s1992 with the enactment of La. R.S. 47:6007.
 
 [10]
 
 The motion picture investor tax credit was created “to encourage development in Louisiana of a strong capital base for motion picture film, videotape, and television program productions, in order to achieve a more independent, self-supporting industry.” La. R.S. 47:6007(A) (1992). The State’s objectives in passing this legislation were to attract private investment for the production of motion pictures, videotape productions, and television programs which contain substantial Louisiana content; develop a tax infrastructure which encourages private investment; develop a tax infrastructure utilizing tax credits which encourage investments in multiple state-certified production projects; encourage increased employment opportunities within the film sector and increase competition with other states in fully developing economic development options within the film and video industry; and encourage new education curricula in
 
 *187
 
 order to provide a labor force trained in all aspects of film productions.
 
 Id.
 
 As originally enacted in 1992, this statute provided for tax credits to offset investment base losses for state-certified productions. La. R.S. 47:6007 (1992). In 2002, La. R.S. 47:6007 was amended to allow credits on investments by Louisiana companies in film to offset certain state tax liabilities on a dollar-for-dollar basis, regardless of whether there was a loss on that investment.
 
 [11]
 
 The statute was amended again in 2003 and 2004.
 
 [12]
 

 In 2005, the legislature enacted Act 456 of 2005, substantially amending La. R.S. 47:6007. Act 456 of 2005 authorized for the first time income tax credits for “State-certified infrastructure projects.” The State’s objective was to encourage development of a Louisiana film, video, television and digital production and post-production infrastructure with state-of-the-art facilities. La. R.S. |fl47:6007(A)(2)(c) (2005). Relative to tax credits for infrastructure projects, Act 456 of 2005 provided that if the total base investment was greater than $300,000, each investor was allowed a tax credit of twenty-five percent of the base investment, and further allowed an additional fifteen percent tax credit until January 1, 2008. Thus, the available tax credits totaled forty percent.
 

 During the 2007 Regular Session, the Legislature again amended La. R.S. 47:6007 by Act 456. Act 456 provided for infrastructure tax credits through January 1, 2009, but imposed limits on those tax credits for applications filed after August I, 2007. Act 456 limited infrastructure credits primarily by increasing and imposing a deadline on the minimum spend necessary to obtain credits, imposing a six-month deadline to begin construction, and imposing a $25 million per project cap on the tax credits. Of significance to the Red Stick infrastructure project is the grandfather clause set forth in Section 3(C) of Act 456, which addressed applications filed on or before August 1, 2007. (See
 
 supra,
 
 p. 3).
 

 The issue before us is the correct interpretation of Section 3(C). Because this matter involves the interpretation of a statute, it is a question of law, and is thus reviewed by this Court under a
 
 de novo
 
 standard of review.
 
 Thibodeaux v. Donnell,
 
 2008-2436, p. 3 (La.5/5/09), 9 So.3d 120, 122. After our review, we “render judgment on the record, without deference to the legal conclusions of the tribunals below. This court is the ultimate arbiter of the meaning of the laws of this state.”
 
 Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc.,
 
 2006-0582, p. 9 (La.11/29/06), 943 So.2d 1037, 1045.
 

 As this Court explained in
 
 M.J. Farms, Ltd. v. Exxon Mobil Corp.:
 

 The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of the government. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. Legislation is the solemn expression of hplegislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the Legislature to enact the law.
 

 The starting point in the interpretation of any statute is the language of the statute itself. When a law is clear and unambiguous and its application does
 
 *188
 
 not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. However, when the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.
 

 2007-2371, p. 13 (La.7/1/08), 998 So.2d 16, 27 (internal citations omitted). With these principles in mind, we examine the language of Section 3(C).
 

 As previously stated, Section 3(C) of Act 456 provides:
 

 An application for an infrastructure project filed on or before August 1, 2007, shall have twenty-four months from the date of approval of the rules or January 1, 2008, whichever is earlier, in which to qualify for the forty percent tax credits earned on expenditures. Tax credits on infrastructure projects shall be considered earned in the year in which expenditures are made, provided that a minimum of twenty percent or ten million dollars of the total base investment provided for in the initial certification that is unique to film production infrastructure shall be expended before infrastructure tax credits can be earned on expenditures. The payment of tax credits may extend beyond or be made after the year expenditures are made. (Emphasis added)
 

 The State argues Section 3(C) is susceptible to more than one reasonable interpretation, and therefore is not clear and unambiguous. The State argues the use of the past tense in “qualify for tax credits
 
 earned
 
 on expenditures” clearly suggests that credits must be actually earned. The words do not say qualify for credits which “will be earned” or “to be earned.” Thus, the statute can be interpreted to mean an application does not qualify for tax credits until expenditures are made, and there is a twenty-four month window for making such expenditures. Moreover, the State argues that “qualify” means to be entitled to a particular benefit or privilege by | n fulfilling a necessary condition. Therefore, an applicant has twenty-four months within which to qualify for the forty percent tax credits earned on expenditures, and the necessary condition which must be fulfilled is the expenditure of monies. Further, the clear wording of the statute suggests the minimum spend is simply a condition for earning tax credits in the year in which expenditures are made.
 

 Red Stick argues the words of Act 456 are clear and unambiguous. Red Stick asserts the State’s interpretation leads to absurd consequences because under that interpretation grandfathered projects would be treated worse under Act 456 than they would have been treated under Act 456 of 2005, where projects would have been entitled to at least twenty-five percent credits. Further, had the legislature intended to require that the entirety of the total base investment be made prior to the expiration of the twenty-four month period, there was no reason to require infrastructure projects spend at least twenty percent or $10 million dollars on the unique to film infrastructure elements.
 

 Red Stick argues that “application” as used in Section 3(C) clearly means the filing submitted to obtain certification. Red Stick points to other usage of the word “qualify” in the statute which suggests that “qualify” means “submit an accepted application.” In the context of Act 456, the only reasonable conclusion is that the deadline set forth in the first sentence of Section 3(C) is a deadline for applica
 
 *189
 
 tions to qualify; a time limit within which an application must be determined to meet the minimum criteria and receive a preliminary certification/qualification letter. Thereafter a project qualified under this standard is entitled to receive forty percent tax credits of its total base investment provided it expended the minimum of twenty percent or $10 million.
 

 Without much analysis or explanation, the lower courts both concluded that|12Act 456 is clear and unambiguous, and supports Red Stick’s position. However, in light of the language used in Section 3(C), and considering the parties’ arguments relative to its meaning, we find the words “to qualify for” to be ambiguous. Looking strictly at the language of Section 3(C), we find both of the interpretations provided by the parties to be plausible. Thus, to correctly interpret Section 3(C) of Act 456, we must examine the legislative intent behind the statute.
 

 We first address the State’s argument that the appellate court erred in allowing the testimony of legislators and other witnesses concerning their interpretations of Section 3(C) to be admitted at trial. While the lower courts did not rely on this testimony to reach their decisions, we review this matter
 
 de novo,
 
 and have the benefit of the full record made below, including evidence of legislative history and the testimony of numerous witnesses, including legislators, relative to their understanding of Section 3(C). We do not find the testimony of the legislators or the other witnesses to be inadmissible
 
 per se
 
 in this case. Some of this testimony is relevant to understand the history of Act 456. Nevertheless, we decline to consider the opinions of the legislators or other witnesses as to the meaning of the statute or the legislature’s intent in passing Section 3(C) of Act 456. How Red Stick, State employees, or even an individual legislator interpreted Section 3(C) is irrelevant. The only relevant issue is the intent of the
 
 entire
 
 legislature in enacting Act 456.
 

 This Court has recognized “that the post-enactment statements of legislators on legislative intent have generally been excluded as having ‘limited value to an understanding of the clear meaning and legal effect of a statute.’ ”
 
 East Baton Rouge Parish School Board v. Foster,
 
 2002-2799, p. 22 (La.6/6/03), 851 So.2d 985, 999 (internal citations omitted). Further, “the understanding of one member, or even a few members, of the legislature is not determinative of legislative intent.”
 
 Id.
 
 This 113same viewpoint is generally applied in state and federal courts nationwide. See Norman J. Singer & J.D. Shambie Singer,
 
 Sutherland Statutes and Statutory Construction,
 
 § 48.16 (7th ed.2010); P. Raymond Lamonica
 
 &
 
 Jerry G. Jones, 20
 
 Louisiana Civil Law Treatise: Statutory Construction,
 
 § 7.11(2010 ed.). Keeping these guidelines in mind, we look to the contemporaneous legislative history, made part of the record below, to determine the Legislature’s intent in passing Section 3(C) of Act 456.
 

 Act 456 originated as House Bill 936 (“HB 936”), authored by Representative Taylor Townsend.
 
 [13]
 
 The original version of the bill did not contain Section 3(C), or a grandfather clause. Discussions concerning adding a grandfather clause began in the House Ways and Means Committee. HB 936 was considered at a meeting of this Committee on May 29, 2007. At that meeting, Sherri McConnell, Director of OEID, gave testimony about the bill. She testified that the intent in drafting the bill was primarily to separate production and infrastructure tax credits more clearly. She explained that the proposed bill kept
 
 *190
 
 infrastructure credit at forty percent, but set a sunset date at the end of 2008,
 
 [14]
 
 and also added a per project cap of $25 million. Ms. McConnell also testified regarding an amendment that was offered adding a “grandfather clause” to deal with projects that had applied under the previous law. The original amendment read:
 

 It is the intention of this act that the approvals provided for in this act and the requirements for state certified infrastructure projects in R.S. 47:6007(C)(2) as amended and reenacted in this act shall be required for any state certified infrastructure project which has not applied for initial certification or pre-certification prior to the effective date of this act.
 

 Relative to the proposed amendment, Ms. McConnell explained:
 

 And then we do also have a grandfather clause that requires — that [14suggests that any projects that have, in fact, applied under the old law will continue to be under the old law. So they are grandfathered in. This — this new law will only — will only pertain to those projects that are — that—will apply after July 1st.
 

 In response to questioning about potential exposure to the State, Ms. McConnell testified that if all pending infrastructure projects came to fruition, the exposure to the State fisc would be approximately $1.5 billion. Jerry Luke LeBlanc, Commissioner of Administration, also testified regarding the bill and amendments, explaining that the proposed bill allowed tax credits to be disbursed over several years.
 

 HB 936 moved to the House Appropriations Committee. The transcript of the Committee meeting on June 7, 2007, reflects that Representative Townsend explained HB 936 to the Committee stating:
 

 What this bill is, an attempt to clean up some of the problems that have developed and have arisen dealing with the film tax credit and particularly with respect to production credits versus-or tax credit for production versus tax credits for infrastructure.
 

 He proceeded to “walk” the Committee through the bill. The bill contained a grandfather clause set forth in proposed Amendment 3. The proposed amendment provided the following language:
 

 (C) an application for an infrastructure project filed on or before December 31, 2006,
 
 shall have twenty-four months from the date of receiving state pre-certification in which to claim the forty percent tax credits earned on expenditures.
 
 These tax credits shall be considered earned in the year in which expenditures are incurred, although the payment of tax credits may extend beyond or be made after, the year expenditures are incurred. (Emphasis added).
 

 The Committee Chairman, Representative John Alario, asked that the amendment be offered, and Representative Townsend asked Bobby Freeman
 
 [15]
 
 to speak about the amendment. Relative to Amendment 3, Mr. Freeman stated:
 

 |1sIt provides that if an application had been filed for an infrastructure project prior to December 31, 2006, that
 
 you’ll have 24 months within which to complete your project
 
 in order to apply for your tax credits from the date of the state pre-certification. It also provides
 
 *191
 
 that the 40 percent tax credits earned on expenditures shall be considered earned in the year in which those expenditures are made, although you may agree with the film office and also with the commissioner of the administration to extend the period of payout beyond the year of expenditure. (Emphasis added)
 

 He further explained: “And this would allow those large, big projects
 
 to be completed within a certain time.”
 
 (Emphasis added).
 

 Later, relative to Amendment 3, Mr. Townsend stated:
 

 Mr. Chairman, what I understand, so that we’re clear here, is that DED has no problem with Amendment No. 3, which is clearly a grandfather.
 
 Those applications,
 
 as Governor Freeman, where he say like [sic] in November,
 
 that would give them some additional time
 
 and they have no problem with that. (Emphasis added).
 

 Bill Black, point person in the DOA for HB 936, was also present at the Committee meeting and expressed no disagreement with these statements. He testified relative to the bill, explaining that it gave the State authority to negotiate a multi-year payout of the tax credit.
 

 HB 936 moved to the House floor, where it passed unanimously. The bill was then referred to the Senate Committee on Revenue and Fiscal Affairs. The transcript of the meeting of that Committee on June 20, 2007, shows that Ms. McConnell and Mr. Black both testified regarding the grandfather clause amendment. The transcript reflects the following colloquy occurred relative to the twenty-four month period (emphasis added):
 

 CHAIRPERSON (Senator Willie Mount): All right. The staff will be working on those amendments. And let me just dovetail Senator Adley’s questions. Right below that on line 22 on page 19,
 
 is there any objection to shall have 24 months to 36 months? Is that a magic number, 24?
 

 UNIDENTIFIED MALE SPEAKER:
 
 It’s a long time.
 

 MS. MCCONNELL:
 
 It allows projects to continue to get 40 percent \ wof those infrastructure tax credits for an additional year.
 
 I would ask perhaps the division of administration might be able to address that question a little bit better than I could.
 

 CHAIRPERSON: All right. Is there someone here on that? I’m not picking on you. I’m just curious as to how that — maybe the flexibility isn’t needed. I’m just asking.
 

 MR. BLACK: Chairman, I’m Bill Black with the Division of the Administration in the Commissioner’s office and I handle film credit issues for him. This amendment, like many others, was not an administration amendment. It was added in House committee.
 
 It would allow those credits who filed before the December 31st date more time to ñnish their project
 
 than those who filed afterwards or those who have yet to file.
 

 CHAIRPERSON: Okay.
 

 MR. BLACK: It also would lock in more credit than the current law allows. One of the issues we have been concerned about throughout this process has been that the projects complete substantial amounts of infrastructure spending before they get the credit so that we’re seeing economic activity that in some form or fashion can offset some of this tax loss. As you expand that two year window of opportunity, the amount of activity in any particular period is going to go down. Now,
 
 I will tell you in conversations I’ve had, most people have felt fairly comfortable that they could get their spending done within
 
 
 *192
 

 the deadline
 
 that
 
 is in the
 
 primary bill, which is 1189.
 

 CHAIRPERSON: So maybe even 24 is too extreme?
 

 MR. BLACK: I think it’s — I won’t say it’s too extreme, but
 
 I think it probably is about as far out as it needs to reasonably yo. Beyond that point, they can diddle.
 

 HB 936 then moved to the Senate floor, where it was amended to add a “minimum spend,” which initially provided for a twenty-five percent of the total base investment before any credits could be earned. The Senate also adopted an amendment providing that the twenty-four month period would commence running from the “effectiveness of all rules promulgated,” not the date of initial certification. HB 936 passed the Senate as amended.
 

 When HB 936 returned to the House floor, Representative Townsend asked that the Senate amendments be rejected because he “was not sure of the effects” of 117the amendments, and he wanted to “make the statute as tight as possible.” The bill was then sent to a Conference Committee.
 
 [16]
 
 The Conference Committee Report, dated June 28, 2007, recommended, in pertinent part, adoption of an amendment comprising the current language of Section 3(C). Specifically, the Conference Committee’s proposed amendment provided that the twenty-four month period would run from the approval of the rules or January 1, 2008, whichever is earlier; reduced the minimum spend to twenty percent, but added the requirement that it must be spent on investment “that is unique to film production infrastructure;” and changed the word “claim” to “qualify for” tax credits.
 
 [17]
 

 The Conference Committee Report was presented to the House and Senate during the final hours of the legislative session. The transcript of the House Floor Proceedings on June 28, 2007, reflects that Representative Townsend presented the Conference Committee Report and stated, in pertinent part:
 

 And basically the bill is — I’m reporting to you the bill is
 
 almost in the posture it was when it left the House.
 
 There — it does allow for earned credits to be applied in the year after the money was spent even if not granted until years later. The Conference Committee also adopted a Senate Floor Amendment which
 
 allows infrastructure projects 24 months fi'otn final approval of the rules to continue to be eliyible for the 40 percent credits,
 
 but it added that if the rules are not approved by January 1 of 2008, the 24 months start running. This would keep people from, you know, trying to sabotage the rules or stymie the process. Any of the grandfathered infrastructure projects that apply before August 1st must spend a minimum of 20 percent of their approved budget or $10 million before they can earn the credits. And the report suggests that we — and that’s it. (Emphasis added).
 

 The only question presented on the House floor was for a clarification that the time period was twenty-four months from January 1, 2008, and that January 1, 2008, was
 
 *193
 
 11snot the deadline. The Conference Committee Report was adopted by the House.
 

 The Conference Committee Report was presented to the Senate by Senator Adley. The only record of these proceedings simply demonstrates that the Senate unanimously voted to adopt the Conference Committee Report.
 

 Based on the above legislative history, it is clear that the information presented to the Legislature regarding HB 936 provided an understanding that grandfathered projects had to be completed within the twenty-four month period to earn tax credits. While the initial proposed grandfather clause in the House Ways and Means Committee contemplated that pending projects would fall completely under the old (2005) law, the legislative history demonstrates that as the grandfather clause developed, subsequent changes and amendments imposed additional requirements or restrictions on grandfathered projects in order to receive tax credits. Testimony in the House Appropriations Committee on June 7, 2007, explained that grandfathered projects will “have 24 months -within which to complete” their projects; and the proposed amendment would allow larger projects “to be completed” within a certain time. In the Senate Committee on Revenue and Fiscal Affairs on June 20, 2007, questions and testimony demonstrate that no one saw a need to extend the twenty-four month period, and the DOA expressed an opinion that most of these projects believed they “could get their spending done” within that deadline. And, when Representative Townsend presented the Conference Committee Report on the House Floor, he stated that the grandfather amendment allowed these projects “to continue to be eligible for the 40 percent credits” for twenty-four months. He did not state that grandfathered projects would continue to be eligible for the forty percent credits for the life of the project.
 

 Red Stick contends that the change of the word “claim” to “qualify for” during the Conference Committee was a substantive change that essentially changed the |19meaning of the proposed law. Red Stick relies on former Representative Townsend’s testimony that he considered this to be a substantive change, supporting Red Stick’s position. We find that Red Stick’s position is not supported by the record and legislative history. Evidence at trial demonstrates that the Conference Committee’s change of the words
 
 “claim
 
 tax credits” to
 
 “qualify for
 
 tax credits” was not a substantive change intending to change the meaning of this requirement from previous amendments. The evidence demonstrates that Ms. McConnell and Mr. Black were instrumental in this word change. Emails, written on the evening before the final day of the session, were introduced at trial wherein Mr. Black suggested that “claim” may not be the best word to use, and suggesting it should be changed to “receive” or “qualify for.” Mr. Black explained in the email that “claim” seemed to mean that the applicant had to submit his audited report within this time frame, and although he was “fine with that,” it may not be what the conferees meant. Ms. McConnell responded that he was correct and it needed to be fixed. Ms. McConnell then forwarded Mr. Black’s email to Allison Pryor, a staff attorney for the House Ways and Means Committee who was involved in the drafting, and with a note agreeing with Mr. Black and suggesting the language be changed to “qualify for.” In addition, the trial testimony of Senators Willie Mount and Ann Duplessis, who both served on the Conference Committee, was in agreement that neither recalled any discussion or debate about this word change, either in Committee or on the Senate floor. Further, had this change been presented
 
 *194
 
 as a substantive change, both agreed there would have been much discussion, and they would have recalled it.
 
 [18]
 
 Moreover, [2nwhen Representative Townsend presented the Conference Committee Report on the House Floor, he did not present this word change as a substantive change, and, in fact, did not discuss the word change at all. Rather, he explained that the bill was essentially in the same posture as when it left the House. Based on the record, it is clear that the change of “claim” to “qualify for” was not intended to be a substantive change, and does not suggest an extension of the previously proposed twenty-four month period. The evidence demonstrates that the word change was simply meant to clarify that the audited cost report need not be filed within the twenty-four month period.
 

 We hold that evidence comprising the contemporaneous legislative history of Act 456 supports the State’s position. The information and testimony presented to legislators in the House and Senate Committees and on the House and Senate floors unquestionably supports an understanding that the twenty-four month period was a window of time for applicants to complete their projects. Nothing in this legislative history suggests that the legislature intended that grandfathered projects be entitled to earn forty percent tax credits for the life of the projects, with no deadline or time limit for incurring expenditures. Moreover, to allow a forty percent tax credit for the life of these projects would provide them with a greater benefit than was afforded under the 2005 law.
 

 CONCLUSION
 

 Transcripts of relevant Committee meetings and Floor Proceedings demonstrate that as the grandfather clause developed, it was clearly presented to the Legislature as requiring grandfathered projects to be completed within the twenty-four month period in order to be entitled to tax credits. This allowed grandfathered projects the benefit of receiving the forty-percent tax credits for a longer period of time than was allowed under the 2005 law. Based on the legislative history, and considering the [⅞1 language of the statute, we hold that Section 3(C) of Act 456 means that a grandfathered project, such as the one submitted by Red Stick, is only entitled to forty percent tax credits on expenditures incurred by January 1, 2010.
 

 DECREE
 

 REVERSED.
 

 [1]
 

 . Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.
 

 [2]
 

 . In its original application, Red Stick sought tax credits for an infrastructure project totaling $955,000,000. However, the application was revised to exclude particular elements (housing components and portions involved in TIF financing) that were not subject to tax credits under the statute.
 

 [3]
 

 . OEID is the successor office of the Governor’s Office of Film and Television Development. La. R.S. 47:6007(A)(7).
 

 [4]
 

 . After review and approval of the project by the DED, OEID and DOA, an initial certification is issued to the applicant approving the project as a state-certified infrastructure project upon such terms and conditions set by the aforementioned state agencies. After an initial certification letter is issued and accepted by the applicant, the applicant is required to submit a cost report of infrastructure expenditures audited and certified by an independent certified public accountant to the DED, OEID and DOA for review. After determining whether the infrastructure expenditures qualify for tax credits, the DED, OEID and DOA will certify the tax credits based upon the approved Louisiana infrastructure expenditures. Tax credits certified by the DED, OEID and DOA can be applied to offset against the Louisiana taxpayer’s income tax liability, or they may be transferred.
 

 [5]
 

 . It is undisputed that rules were not promulgated prior to January 1, 2008. Thus, the relevant date for our purposes is twenty-four months from January 1, 2008 (i.e., January 1, 2010).
 

 [6]
 

 .
 
 Red Stick Studio Development, L.L.C. v. State of Louisiana, et al.,
 
 2009-1347 (La.App. 1 Cir. 12/23/09), 30 So.3d 803.
 

 [7]
 

 . La. R.S. 24:177 provides:
 

 A. When the meaning of a law cannot be ascertained by the application of the provisions of Chapter 2 of the Preliminary Title of the Louisiana Civil Code and Chapter 1 of Title 1 of the Louisiana Revised Statutes of 1950, the court shall consider the intent of the legislature.
 

 B. (1) The text of a law is the best evidence of legislative intent.
 

 (2)(a) The occasion and necessity for the law, the circumstances under which it was enacted, concepts of reasonableness, and contemporaneous legislative history may
 
 *186
 
 also be considered in determining legislative intent.
 

 (b) The legislature may express the intended meaning of a law in a duly adopted concurrent resolution, by the same vote and, except for gubernatorial veto and time limitations for introduction, according to the same procedures and formalities required for enactment of that law.
 

 C. The legislature is presumed to have enacted an article or statute in light of the preceding law involving the same subject matter and court decisions construing those articles or statutes, and where the new article or statute is worded differently from the preceding law, the legislature is presumed to have intended to change the law.
 

 D. A bill introduced but which does not become law is not competent evidence of legislative intent. Any action by the legislature other than enactment of law or adoption of a resolution as provided in Subpara-graph (B)(2)(b) of this Section shall not constitute a confession as to the meaning of the law extant.
 

 E. (1) The keyword, one-liner, summary and adjoining information, abstract, digest, and other words and phrases contained outside the sections of a bill following the enacting clause are solely to provide the members of the legislature with general in-dicia of the content of the bill and are not subject to amendment by the legislature or any committee of the legislature and shall not constitute proof or indicia of legislative intent.
 

 (2) Fiscal and actuarial notes provide the legislature with an analysis of the potential fiscal impact of a bill based on presumptions made by the legislative fiscal officer, actuary, economist, or analyst preparing the note and shall not constitute proof or indicia of legislative intent.
 

 (3) Committee minutes are summary reports of committee proceedings and shall not constitute proof or indicia of legislative intent.
 

 (4) Words and phrases not constituting the substance of an amendment or the recommendations of a conference committee report, and any other legislative staff documents which are not subject to amendment by the legislature or any committee of the legislature, shall not constitute proof or in-dicia of legislative intent.
 

 [8]
 

 . Specifically, the State of Louisiana by and through the Department of Economic Development; State of Louisiana by and through the Division of Administration; and the State of Louisiana by and through the Office of Entertainment Industries Development.
 

 [9]
 

 .
 
 Red Stick Studio Development, L.L.C. v. State of Louisiana, et al.,
 
 2010-0193 (La.4/16/10), 31 So.3d 1069.
 

 [10]
 

 . 1992 La. Acts 894.
 

 [11]
 

 . 2002 La. Acts 6.
 

 [12]
 

 . 2003 La. Acts 1240; 2004 La. Acts 7.
 

 [13]
 

 . Seventy-two additional legislators eventually signed the legislation as co-authors.
 

 [14]
 

 . HB 936 provided for infrastructure tax credits to end on January 1, 2009.
 

 [15]
 

 . Bobby Freeman, former Lieutenant Governor of Louisiana and former State Representative, testified as a representative of Studio City, an infrastructure project which was planned for West Baton Rouge Parish.
 

 [16]
 

 . A conference committee is composed of three members from each house, the purpose of which is to propose to the two houses a means to resolve differences in a bill when the house of origin refuses to concur in amendments adopted by the opposite house. See La. House of Rep. Rules 6.14, 7.11, and 8.27.
 

 [17]
 

 . It was undisputed at trial that no meeting of the Conference Committee occurred and no additional evidence was presented to the Conference Committee members. Thus, there is no relevant video or transcription.
 

 [18]
 

 . As explained earlier in our opinion, we do not find the testimony of the legislators to be inadmissible
 
 per se.
 
 While we decline to consider the opinions of former Representative Townsend or Senators Mount and Duplessis as to the meaning of Act 456, we find this particular legislative testimony relevant to understand the history of Act 456. Specifically, this testimony is relevant to aid us in determining what information was presented to legislators in Committee or on the Senate Floor.